UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTIN THOMAS MORALES (1),<br>CHASE LOGAN GUZMAN (2), and<br>DANIEL HUNTER GUZMAN (3),<br><br>Defendants. | 4:16-CR-40124-KES<br><br><br>REPORT AND RECOMMENDATION |

**INTRODUCTION**

Defendants Justin Thomas Morales, Chase Logan Guzman, and Daniel Hunter Guzman are before the court on a superseding indictment charging all three with conspiracy to distribute methamphetamine. See Docket No. 50. In addition, Chase Guzman is charged with carrying a firearm in furtherance of a drug trafficking crime. Id. All three defendants have filed motions to suppress certain evidence. See Docket Nos. 73, 76, 84, 91, 103, 104 & 105. The government resists these motions. See Docket No. 96 & 106. These motions were referred to this magistrate judge for the holding of an evidentiary hearing and the issuance of a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

# FACTS

An evidentiary hearing was held in this matter on Wednesday, August 16, 2017.  Present at the hearing were Justin Morales and his lawyer, Janet Olson; Daniel Hunter Guzman and his lawyer, Joshua Zellmer; and Chase Guzman with his lawyer, John Hinrichs.  The government was represented by its Assistant United States Attorney, John Haak.

The following five witnesses testified at the hearing:  Special Agent Brent Fair of the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF); Trooper Andrew Steen of the South Dakota Highway Patrol; Detective Daniel Christiansen of the Minnehaha County Sheriff's Office; Officer Jason Christensen of the Sioux Falls Police Department; and Detective Adam Buiter of the Sioux Falls Police Department.  All but Trooper Steen and Officer Jason Christensen are members of the Sioux Falls Area Drug Task Force, an inter-agency cooperative of law enforcement officers who investigate drug and firearms offenses in the greater Sioux Falls area.  In addition to the testimony of the witnesses, 16 exhibits were introduced into evidence.  From this evidence, the court makes the following findings of fact.

On approximately March 10, 2016, a confidential informant ("CI") contacted ATF Special Agents Emmet Warkenthien and Brent Fair.  The CI had information about a man named "Speedy" from Wichita, Kansas, whom the agents later identified to be defendant Justin Morales.  This CI had provided information in the past to ATF that had proved reliable.

The CI stated Justin was importing wholesale quantities of methamphetamine from Wichita to Sioux Falls, Wagner, and Lake Andes, South Dakota, for sale. Justin had contacted the CI to attempt to recruit his help in distributing meth in South Dakota. The CI also told ATF that Justin indicated he would be willing to sell firearms to the CI. ATF began investigating Justin.

A criminal history check of Justin indicated he had multiple convictions for felony crimes, making him a person who was prohibited from possessing firearms under federal law. At ATF's direction, the CI made arrangements to meet with Justin on April 20, 2016, in Sioux Falls.

Many, if not all, of the CI's telephone contacts with Justin Morales were recorded. Between March 10, 2016, and September 22, 2016, there were over 40 such recordings. ATF instructed the CI to never take an incoming call. Instead, ATF instructed the CI to allow incoming calls from Justin to go to voice mail and then later return the call to Justin and to record the return call. Thus, the majority if not all of the recordings reflect the CI calling Justin. In addition, Justin sometimes communicated with the CI via video. ATF agents captured still-frame video shots of Justin from the CI's phone from these video calls from Justin.

On April 20, 2016, Justin was to bring the CI a "sample" of the meth he was offering for sale to test its quality. Justin gave the CI this sample at a local Sioux Falls gas station on the corner of 14th Street and Minnesota Avenue.

Justin was offering up to a pound of meth for sale to the CI if the quality of the drug was acceptable to the CI.

After the meet at the gas station, the CI provided the sample to ATF. It tested positive for methamphetamine. Thereafter, the CI contacted Justin and made arrangements to purchase five ounces of meth from him. This transaction occurred with $5,000 of pre-recorded buy funds provided by the ATF. The CI exchanged the $5,000 for the five ounces of meth at a meet location in a parking lot near the Texas Roadhouse Restaurant in Sioux Falls. Both Agent Fair and Agent Warkenthien observed this transaction through surveillance and saw Justin.

Another transaction was attempted to be set up by the CI in Kansas City for June 20, 2016. In recorded phone calls, Justin agreed to meet the CI in Kansas City and sell him methamphetamine as well as a Ruger .22 caliber competition pistol. Ultimately, Justin did not show up at the meet and attempted to get the CI to travel to Wichita. The meet did not occur.

On September 22, 2016, the CI contacted ATF to say that Justin had just arrived in Sioux Falls with defendant Chase Guzman from Wichita. Justin told the CI they had methamphetamine and marijuana they wanted to sell in Sioux Falls and Lake Andes. The CI told ATF Justin and Chase had arrived late in the evening on the 21st or early in the morning on the 22nd and were staying at the Days Inn hotel in Sioux Falls near the intersection of 41st Street and Marion Road, west of Interstate 29 (I-29). The CI had made plans to meet with Justin and Chase the morning of the 22nd.

Agent Fair drove to the Days Inn hotel and confirmed two vehicles with Wichita, Kansas, license plates as the CI had described. One was a grey or bluish-grey Dodge Grand Caravan minivan registered to Jacqueline Morales. The other was a dark blue Chevrolet Silverado pick-up truck registered to Chase. Agent Fair returned to meet with Agent Warkenthien to inform him of what he had observed at the hotel and to listen to the CI's recording of the meeting with Justin and Chase. Agent Fair then returned to the hotel parking lot to conduct surveillance on the Kansas vehicles. As other agents or officers from the Sioux Falls Area Drug Task Force came to work that day, they began to assist Agents Warkenthien and Fair with surveillance at the hotel, the Jerri Young Running Crane trailer (explained further below), and following defendants' movements around town. Members of the task force had a radio channel they were all using and information was shared with each other in a contemporaneous and fluid manner between them all as events on the day of September 22 unfolded.

The CI traveled to Justin and Chase's hotel the morning of September 22 and recorded a conversation with them. Justin told the CI he had three pounds of marijuana for sale and two pounds of methamphetamine. Some of the drugs were intended for distribution in Lake Andes and some in Sioux Falls. Justin told the CI the drugs were being guarded by defendant Daniel Hunter Guzman ("Hunter") at the Young Running Crane trailer home in Sioux Falls and that Hunter was armed with a firearm. The trailer was near 12th Street in Sioux Falls, west of I-29, approximately 29 blocks north of

defendants' hotel. Justin told the CI that Jerri Young Running Crane was aware of the bag in her home, but not aware Hunter was armed.

At this meeting, Justin made reference to a Glock 19, Generation 4, 9 millimeter (mm) handgun. Justin told the CI that the Glock could be for sale for the right price, but that he and Chase wanted to keep the firearm in their possession for protection during their drug run to Lake Andes. Chase described the gun to the CI, identifying it as a Model 19, Generation 4. Justin indicated that Chase, who was not a felon and could therefore possess guns, was carrying the Glock at the time. During the recording of this meeting, Agent Fair testified there was the sound of the Glock being racked, suggesting that Chase was demonstrating the gun for the CI. Later in the day on September 22, law enforcement arrested Chase and found a Glock handgun matching the description provided by the CI on Chase's person.

Justin told the CI he and Chase were going to have Hunter and another male with Hunter, Cruz Young Running Crane, bring some of the drugs to Justin and Chase. Justin told the CI he and Chase were going to take an ounce or two of meth to Lake Andes to sell, bringing the Glock with them. They would return to Sioux Falls in a couple of days. Hunter would stay with the remaining drugs at the Young Running Crane trailer in Sioux Falls while Justin and Chase made the trip to Lake Andes.[1] This first meeting on September 22 between Justin, Chase and the CI ended with Justin and Chase

---

[1] In the recordings of the meeting, Justin repeatedly refers to taking the drugs to the reservation or "the rez." He identified Lake Andes as "the rez" to which he was referring.

departing in the grey minivan with Kansas plates. Justin and Chase told the CI they were going to meet with Hunter and Cruz to obtain part of their store of drugs. Justin and Chase made arrangements to meet the CI again for a late breakfast or lunch that same day.

Other officers conducting surveillance reported that Justin and Chase traveled to a coffee shop in Sioux Falls and met with the CI there. Justin and Chase got into the grey van and left, with the CI following in his own vehicle. The three headed back to the Days Inn hotel.

When Agent Fair arrived at the hotel parking lot for the second time to conduct surveillance, the grey minivan was gone but the blue pick-up truck was there. As Agent Fair watched, he saw the grey minivan return and Justin and another male get out of the van. Although Agent Fair was not able to positively identify the other male as Chase Guzman, other officers conducting surveillance could and did identify Chase as the second male and so informed Agent Fair over the radio. Chase and Justin then got into the CI's vehicle and the three of them left the hotel parking lot to go to lunch. Sometime later, late morning or at noon time, the three men returned to the hotel parking lot. The CI dropped Justin and Chase off and then left in the CI's own vehicle. Law enforcement conducting surveillance had observed Justin access the blue pick-up and bring a Little Caesar's pizza box out of the back seat area of the pick-up and carry it into the grey van.

After the CI parted company with Justin and Chase, the CI told law enforcement that Justin and Chase now had the drugs with them. The CI told police the meth was in a white pizza box.

Contemporaneous with the transmission of this information, Justin and Chase were getting into the grey van and beginning to drive away. Agent Warkenthien began at this time working on trying to locate a marked patrol vehicle that could intercede with Justin and Chase to make a traffic stop. Agent Fair and others testified they wanted a marked police car to stop Justin and Chase for several reasons. Justin and Chase were armed. Police did not want the confrontation with the defendants to turn violent or to have defendants flee. If defendants did attempt to flee, officers wanted a marked patrol car able to pursue them. The officers also did not want to alert defendants that they were being followed by unmarked cars and possibly have defendants discard the drugs. So as not to arouse the defendants' suspicions, they wanted the stop of defendants' vehicle to appear as much as possible like a normal traffic stop. Therefore, a marked police patrol vehicle was sought to make the stop.

Detective Dan Christiansen, a member of the Minnehaha County Sheriff's Office and a drug task force member, contacted Trooper Andrew Steen of the South Dakota Highway Patrol, who agreed to make the traffic stop. Trooper Steen was not on the radio channel being shared by members of the task force, so Det. Christiansen relayed information as he heard it over the radio to Trooper Steen via telephone to try to place Trooper Steen in the same

vicinity as the grey van. Some other member of the drug task force contacted Officer Jason Christensen of the Sioux Falls Police Department and also asked him to make a traffic stop of Chase and Justin.

In this regard, the drug task force asked the officers driving marked patrol vehicles to simply make a stop, not to follow defendants in an effort to establish independent probable cause arising from a traffic violation. The drug task force felt the situation was too time-sensitive and untenable to allow for a marked patrol car to follow defendants' van for any appreciable period of time.

Other members of the drug task force were following the grey van. They observed the van return to the Young Running Crane trailer where both Justin and Chase exited the van and entered the trailer. Then Justin, Chase, and a third unidentified male exited the trailer and reentered the van and began driving. Agent Warkenthien returned to the Law Enforcement Center in Sioux Falls to begin drafting a search warrant for the Young Running Crane trailer.

Surveillance of the grey van showed it exiting the housing area and traveling to a Hardee's restaurant on West 12th Street. The third unidentified man who was neither Justin nor Chase exited the van at the Hardee's and the grey van kept driving.[2]

The van led surveillance officers on a circuitous route, first driving south on I-29, then exiting onto 26th Street, then driving west through a parking lot

_____

[2] Later investigation revealed the third male who rode in the van from the Young Running Crane trailer to the Hardee's restaurant legitimately had a job working at Hardee's and was not involved in the drug-related activities being investigated by police that day. It appears Justin and Chase merely gave this male a ride to work.

of a Hy-Vee grocery store on 26th Street and Marion Road, then taking a back road connecting Hy-Vee to a local Lowe's hardware store, and then driving in a complete circle around the Lowe's building. Officers surmised that Justin and Chase were making a "burn run"--taking such driving maneuvers to determine whether they were being followed.[3] Eventually, after driving in essentially a big square, the van traveled north again to the vicinity of Marion Road and West 12th Street where Trooper Steen was able to arrive at the van's location.[4]

Trooper Steen pulled up behind the van at approximately 15:06:36. Both vehicles were stopped at a red light. Trooper Steen waited until the light turned green, at which time both vehicles proceeded through the intersection. Trooper Steen activated his lights at 15:07:58. The van pulled over to the right-hand curb and stopped at 15:08:22.

Trooper Steen exited his patrol car and approached the driver's door where he made contact with Justin at 15:08:34. Officer Jason Christensen arrived on the heels of Trooper Steen in his own marked patrol vehicle. As Trooper Steen was making contact with Justin, Officer Christensen made contact with Chase on the passenger side of the van at 15:08:39.

---

[3] Det. Christiansen stated drug traffickers will often drive into areas with low population or low density traffic such as cul-de-sacs and similar areas so that any vehicles that are following them will be exposed. Det. Christiansen felt defendants had spotted him during the burn run and the officers' surveillance was compromised. That was one of the reasons Trooper Steen was instructed to simply stop defendants' van instead of waiting to see a traffic violation.

[4] A video recording of the traffic stop, Exhibit B, was introduced into evidence. The following recitation of events is taken from that exhibit, supplemented as necessary by witness testimony.

Trooper Steen stated to Justin, "Hello, Highway Patrol, you have a broken taillight on your vehicle. Do you have your license, insurance and registration?" Trooper Steen readily agreed at the hearing that the broken taillight justification he announced to Justin was a ruse. The video clearly shows both taillights on the van were in working order just before the stop. Trooper Steen explained he knew there was a firearm in the van and he wanted to get Justin out of the van without tipping him off that this was anything other than a routine traffic stop.

Justin told Trooper Steen he had no driver's license or identification with him. At this point, 15:09:28, Trooper Steen asked Justin to exit the van and take a seat in Steen's patrol vehicle where he said he would "run [Justin's] name." Justin exited the van and seated himself in the front passenger seat of Trooper Steen's patrol vehicle. The front doors to the patrol vehicle were unlocked.

Once both men were seated in the patrol vehicle, Trooper Steen asked Justin if he still lived in Kansas. He then asked what he was doing in South Dakota. Justin said he was visiting family. Steen asked where they lived. Justin said "all over, on the reservation, at Yankton." Trooper Steen obtained Justin's full name and date of birth. He then told Justin at 15:10:50 that he would write Justin a warning ticket for the taillight infraction. At 15:11:27 Trooper Steen advised Justin his driver's license was suspended.

Meanwhile, at 15:08:07, Officer Jason Christensen on the passenger side of the van appears to be looking down at something in his hand, presumably

11

Chase's identification.[5]  Officer Christensen then asked Chase to exit the van and come back to Officer Christensen's patrol vehicle with him.  This occurred at 15:09:47.  At this point, Trooper Steen and Justin had just settled themselves in the front seats of Trooper Steen's patrol vehicle.

When Chase opened the passenger door, Officer Christensen saw a small baggie of marijuana sitting near the door sill, between the front passenger seat and the front passenger door.  Officer Christensen testified this baggie was not visible to him prior to the time Chase opened the passenger door.  Officer Christensen handcuffed Chase almost immediately as he exited the van and then searched him.[6]  Officer Christensen found a glass marijuana pipe in Chase's shorts pocket.  These events unfolded directly in front of Trooper Steen's vehicle, in full view of Justin.  At the time Chase was handcuffed, Trooper Steen and Justin were just beginning to talk about why Justin was in South Dakota and where his relatives lived.

At 15:10:50 Officer Christensen entered the passenger space in the front of the van and retrieved something from that area of the van's interior.  This is

[5] No separate video recording was introduced documenting Officer Christensen's conversation with Chase.  All conversation recounted herein between Chase and Officer Christensen, therefore, is based on Officer Christensen's testimony at the hearing.  To the extent his movements are visible in Exhibit B, those movements are chronicled based on that exhibit.

[6] Officer Christensen testified he handcuffed Chase when he saw the marijuana.  The "almost immediately" is an observation based upon Exhibit B. In the video, Chase exits the van and immediately turns and faces the van, facing away from Officer Christensen, with his hands behind him.  Officer Christensen is standing outside the camera frame at this point and cannot be seen.

when Officer Christensen's search of the van began.  Again, these events occurred in full view of Trooper Steen and Justin.

At 15:11:28 there is a beeping noise heard on the video from the interior of Trooper Steen's vehicle.  Immediately, at 15:11:32, Trooper Steen speaks into a radio or microphone and identifies himself by call number ("Sioux Falls HP" followed by an inaudible number).  Immediately after this he asked Justin, "you guys got some dope on you?"  Justin admitted they had some.  "Anything else inside the vehicle?" Trooper Steen asked.  Justin denied there was anything else.

Trooper Steen continued to talk to Justin, asking if he knew why his driver's license was suspended and how long he had been in South Dakota.  Trooper Steen asked Justin when he would be leaving South Dakota.  Justin replied, "no tellin' now."  Trooper Steen asked Justin of which (Native American) tribe he was a member.

At 15:13:29 Officer Christensen talked to Trooper Steen, explaining that he found a baggie of marijuana laying in the van and a pipe.  Officer Christensen explained that he was going to search the van.  It sounds on Exhibit B as though Trooper Steen exited his vehicle in order to have this conversation with Christensen—there is a shuffling noise and a car door can be heard slamming—but no movement is visible in the video.  It is unknown *if* Trooper Steen did exit the vehicle, whether Justin was able to overhear the officers' conversation from his seat inside Trooper Steen's patrol vehicle.  Immediately after Trooper Steen and Officer Christensen concluded their

discussion, at 15:14:00 Officer Christensen began searching the grey van in earnest, first in the area of the driver's seat, then the passenger area behind the driver's seat, then the area behind the front passenger seat.

While this search happened in full view, Trooper Steen reseated himself in his vehicle and continued questioning Justin. A steady barrage of questions ensued, including queries about where Justin had been staying in Sioux Falls, his place of work, his home address, how he was able to buy gas without an ID, and how much cash he had on his person. Justin apparently pulled his cash out of his pocket and showed Trooper Steen he had approximately $300. Trooper Steen then asked, "why do you have so much money for?" Justin replied he did not think that was a lot of money.

At 15:16:59, Trooper Steen exited his patrol vehicle and walked around the front of the vehicle to the passenger door. At 15:17:28 Officer Christensen told Trooper Steen he found a brick of marijuana in the grey van. It appears Trooper Steen then asked Justin to exit the patrol vehicle, handcuffed him, and placed him in the rear of the patrol vehicle. The time on the video was 15:18:03. Trooper Steen then counted the cash ($268) he took from Justin on the hood of his patrol vehicle and helped Officer Christensen finish searching the grey van. In addition to the other items discussed above, the officers also found a digital scale which had methamphetamine residue on it and multiple cell phones. Both defendants were placed under arrest. Officer Christensen transported Chase to the Detective Division at the Sioux Falls Police

Department.  Trooper Steen similarly transported Justin to the same location.  Each defendant was placed in a separate interview room.

While Trooper Steen was transporting Justin, there was a long period of silence that was broken when, at 15:33:36, Justin asked without any question being posed from Steen, "y'all takin' me to county jail?"  Trooper Steen replied, "uh, eventually, yes."  Justin then asked, "where am I headed to now?"  Trooper Steen said, "down in that area."  Justin then asked why he was not being taken to "the county.  I thought I was arrested."  Trooper Steen said, "I just do what I'm told."  Trooper Steen assured Justin he would be taken to county.

Justin then asked, "what am I bein' charged with?"  Trooper Steen answered, "possession, marijuana, there's paraphernalia in the vehicle, and a distribution count."

"Is that felony?  Felony distribution of marijuana?  That's what I'm bein' charged with?" Justin asked.  "And possession of marijuana and drug paraphernalia," Trooper Steen replied.  Justin asked what "my partner" was being charged with.  Trooper Steen said, "same thing."

Justin then asked, "how come they didn't impound my van?"  Trooper Steen replied that it was being impounded.  Justin asked, "is that how you guys do it?"  Trooper Steen replied in the affirmative, adding, "it saves you a tow bill."  "So where's it being impounded to?" Justin asked.  "Down by the city," said Steen.  "So every time you arrest somebody then you jump in their car and impound it like that?" asked Justin.  "The city does things different

than we do.  'Cause I don't have people beside me all the time," replied Steen. "What are you, highway patrol?" asked Justin.  Trooper Steen said "correct."

Justin then informed Trooper Steen he knew what was going on, that this "ain't my first rodeo, man."  He stated he knew what was going on and he was just testing Trooper Steen to see if he was being truthful with Justin. Justin then went on to observe that Steen was being truthful, but was "beatin' around the bush."  Justin said he knew he was in custody and knew he was going to jail and "nothin' was gonna' change that."

Trooper Steen said they were going to search his van.  Justin asked what if law enforcement "planted" something in his van.  Trooper Steen assured Justin nothing would be planted.  Trooper Steen then said, "now that you tell me that, we're going to find something more."

Justin then said the police were not going to find anything other than the marijuana they already found and that he would "take that all day.  If, if I could recall, I don't even know who put that s**t in there. You guys could've put that in there. . . .  That s**t was in the back seat. . .  I don't know where that s**t come from."

"So y'all gonna just try us both for the same thing?  How's that gonna work out?  It only belongs to one person."  Trooper Steen then said the drugs did not have to be in his pocket for it to be possession.  Justin replied that it was just one little brick, that was all police were going to find.  Justin then told Trooper Steen he had seen him previously by the Hardee's.  Justin then asked what kind of bond would be set for him.  Trooper Steen said the judge would

set it.  Justin then asked what kind of marijana laws they had here.  Trooper Steen said South Dakota was not California or Colorado.

Justin said he bet the court was "filled" with marijuana charges.  Trooper Steen made a noncommital noise.  Justin then asked, "so the ATF is your guys' flunkies?"  Trooper Steen replied, "you could call 'em that."  Justin laughed and said, "I'm not callin' them that.  I'm just sayin' because you make it look like they're gonna go search my car."  Trooper Steen replied that they all just worked together and helped each other out.  "Do you guys always have ATF on your traffic stops?" Justin asked.  "Not always," Trooper Steen replied.  "But this is special," interjected Justin.  "You're not special" replied Steen.

A period of silence ensued for approximately 45 seconds.  Then Trooper Steen asked without prompting from Justin how Justin was able to rent a hotel room for the night without an ID.  Steen related that he always had to show an ID before he could rent a room.  Justin replied, "sometimes you just gotta be special."  Trooper Steen pulled into the police complex parking lot a short time later.  Exhibit B ends at this point.  Trooper Steen testified that at no time from the beginning of the traffic stop would Justin have been free to leave.

At the police headquarters, Chase was advised of his <u>Miranda</u> rights, which he waived, and he was then interviewed by ATF Special Agent Kevin Wiese, with ATF Special Agent Franklin Gonzalez also attending.  Chase admitted he was aware of the marijuana in the van.  He adamantly denied any knowledge of methamphetamine or firearms.  He also indicated he knew Justin was distributing marijuana.  At this point, Agent Wiese turned Chase over to

jail staff to be booked into the jail.  During a search of Chase's person pursuant to booking, jail staff discovered a Glock 19 9 mm loaded handgun in a holster in Chase's waistband.

At this point, a second interview was convened of Chase by Agents Wiese and Gonzalez.  Having been caught red-handed with the Glock, Chase admitted to possessing it and explained it was his gun that he had purchased for $600 from a friend.  The agents admonished Chase it was a crime to lie to a federal agent.  They asked Chase again about methamphetamine.  He again denied any knowledge of methamphetamine.  The agents ended the interview and returned Chase to jail staff.  During another routine booking search, jail staff found approximately one ounce (29 grams) of methamphetamine hidden in Chase's crotch.

While officers were involved in the stop of Justin and Chase's van and subsequent events, surveillance at the Young Running Crane trailer home was ongoing.  One of the officers conducting surveillance, Sioux Falls Police Detective Adam Buiter, observed a different minivan, a Chevrolet Uplander, arrive at the trailer.  Cruz and Hunter made contact with the occupants of the van and then the van left after a very short time.  Other agents conducted a traffic stop on this other van, but located no controlled substances in the van, only some paraphernalia.  One of the occupants of the Uplander was arrested on an outstanding arrest warrant; other occupants of the van were interviewed by police.

Later, Det. Adam Buiter and Det. Dan Christiansen were surveilling the trailer when they saw Cruz and Hunter[7] leave the trailer on foot. Det. Buiter testified at this point he knew: (1) Hunter and Cruz had been involved in a short-term stop at the Young Running Crane trailer by the Uplander van; (2) Agent Warkenthien was in the process of applying for a search warrant for the Young Running Crane trailer and any occupants; and (3) the CI had said Hunter was armed with a gun. Although Det. Buiter had been given a physical description of Hunter, he had not seen a photo of Hunter, so he was not sure whether either of the two men exiting the trailer was indeed Hunter.

The two officers followed Hunter and Cruz in their unmarked cars and Det. Buiter pulled up to the curb in front of the two men approximately one to two blocks away from the Young Running Crane trailer. Det. Christiansen pulled up to the curb in his car behind the two men. Det. Buiter exited his car wearing a vest with large words on it identifying him as police. He also made sure his police badge was exposed and able to be seen. As soon as Cruz saw Det. Buiter coming around the front of his car, Cruz took off running on foot. Det. Buiter pulled his service pistol, pointed it at Hunter, announced "Police!" and asked Hunter his name. Det. Buiter then ordered Hunter to get on the ground and handcuffed him. Det. Buiter smelled a strong odor of raw marijuana emanating from Hunter's person.

Det. Christiansen stayed a short time to see if Buiter needed assistance and then pursued Cruz on foot, to no avail. Cruz was never apprehended.

---

[7] The court uses the names of the men in this opinion for ease of reference, but at the time, neither Det. Buiter nor Det. Christiansen knew the men's names.

Det. Buiter conducted a pat search of Hunter. He asked Hunter if he had any weapons or drugs on him. Hunter did not answer. Det. Buiter found eight grams of methamphetamine in one of Hunter's pockets, an LG phone, and a business card for a Kansas parole officer. No firearms were found. Hunter was arrested and transported to the jail by another officer in a marked patrol car.

After Hunter was taken away, Det. Buiter called the parole officer whose card he had found in Hunter's pocket. That officer indicated Hunter was on parole in the state of Kansas.

While events unfolded at the traffic stop and the trailer home, Agent Warkenthien was back at the office listening to radio communications among the members of the drug task force and typing up an affidavit and application for a search warrant. He sought permission to search the Young Running Crane trailer, the blue Chevrolet Silverado pick-up belonging to Chase, and all persons present at the Young Running Crane house during the execution of the search warrant. See Exhibit 1. The affidavit, in pertinent part, stated the following:

> On 09/22/2016, your affiant was contacted by the Bureau [sic] Alcohol, Tobacco, Firearms and Explosives (ATF) Confidential Informant (CI) #11219. CI #11219 is known to your affiant as providing reliable information in the past and has conducted several controlled purchases of firearms and narcotics from individuals that have resulted in the arrest and conviction of said individuals in state and federal Court. CI #11219 indicated that two individuals known to the CI as Justin MORALES, aka "Speedy" and Chase GUZMAN had traveled from Wichita, KS to Sioux Falls, SD with an [sic] approximately two (2) pounds of methamphetamine and approximately three (3) pounds of marijuana to distribute in the Sioux Falls, SD and surrounding

20

area.  CI advised MORALES was staying at the Days Inn off W. 41st Street, Sioux Falls, SD.

Continuing on 09/22/2016, your affiant states that ATF Special Agent (SA) Brent Fair traveled to the Days Inn located at 3401 W. Gateway Blvd., Sioux Falls, SD and observed two Kansas plated vehicles parked outside the hotel building.  The one vehicle described as a gray Dodge Grand Caravan, bearing Kansas plate 191JVZ is registered to a Jacqueline Ann MORALES, 1846 S. Main Street, Wichita, KS 67213.  The other vehicle is registered to a Chase Logan GUZMAN at 2723 W. Oxberry Street, Wichita, KS 67217.

Your affiant states that members of the Sioux Falls Area Drug Task Force (SFADTF) set up surveillance of the vehicles at the Days Inn. At approximately 1:38pm, surveillance observed two individuals carrying a small white box get into the gray Doddge Grand Caravan bearing Kansas plate 191JVZ and proceed to drive to [the Young Running Crane trailer] in Sioux Falls, SD.  The two individuals then went inside the residence that is described as a . . . double-wide trailer with white skirting around the bottom and doors on the east side and west side of the trailer.

Your affiant states that members of the SFADTF set up surveillance of the [Young Running Crane residence].  At approximately 3:20pm, surveillance units observed two individuals exit the trailer and get into the gray Dodge Grand Caravan bearing Kansas plate 191JVZ and leave the area.  Surveillance units continued to follow the vehicle.  At approximately 3:30pm, surveillance units had the vehicle stopped by a SD Highway Patrol Trooper and a marked Sioux Falls Police Department Patrol vehicle at 9th Street and Marion Road, Sioux Falls, SD.  Following the stop of the vehicle, law enforcement came into contact with the two individuals in the van.  The driver was identified as Justin MORALES and the passenger was identified as Chase GUZMAN. Your affiant states that when the Sioux Falls PD officer had MORALES step out of the vehicle to come back to his patrol unit, he observed a small plastic baggie containing approximately an ounce of marijuana in plain view between the front seat and the center console.  The Sioux Falls PD officer then detained MORALES and GUZMAN and placed them into his patrol vehicle. A search of the vehicle and MORALES and GUZMAN's persons was then conducted and law enforcement located and seized a duffle bag containing approximately one pound of marijuana, three cellular phones, a small digital scale and an unknown amount of

cash.  MORALES and GUZMAN were then placed under arrest and
transported to the Sioux Falls Police Department.

Your affiant states that law enforcement went back to the Days Inn
located [sic] 3401 Gateway Blvd, Sioux Falls, SD and spoke with
the front desk personnel.  Days Inn confirmed that Chase
GUZMAN had stayed in Room 220 last night but had since
checked out this morning. . . .

See Exhibit 1, pp. 2-4.

Agent Warkenthien presented his application and affidavit to a South

Dakota state circuit court judge, who issued the search warrant.  See Exhibit

14.  In a search of the Young Running Crane trailer, among other things, two

pounds of methamphetamine  and two pounds of marijuana were found in a

cloth grocery sack under a bathroom sink as well as an empty Little Casear's

pizza box.  See Exhibits 4-5, 8-11.  The grocery sack was printed with words

indicating it was associated with a Missouri business.  See Exhibit 5.  The

search of Chase's pick-up revealed some 9 mm ammunition, a spare magazine

for a Glock Model 19 9 mm pistol, and a second holster for the gun.

On October 21, 2016, Agent Warkenthien applied for search warrants

from this magistrate judge, seeking permission to search the cellular phones of

Justin, Chase and Hunter.  See 4:16-mj-00062-VLD ;4:16-mj-00063-VLD, and

4:16-mj-00064-VLD.[8]  The affidavits Agent Warkenthien submitted for these

three search warrants were similar to the affidavit submitted to the state court

judge on September 22, with the following changes or additions.  In the first

---

[8] The evidence regarding these search warrants was not introduced into
evidence during the hearing, but various references were made to them.  The
court takes judicial notice of the search warrants pursuant to FED. R. EVID.
201.

part of the affidavit, Agent Warkenthien clarified that the two men seen getting into the grey Dodge Grand Caravan at the Days Inn carrying a small white box were the same two men who were later seen enter the Young Running Crane trailer and emerge again from the trailer.  Id.  The affidavit also recounted the items found during the execution of the state court search warrant at the Young Running Crane trailer.  Id.  The affidavit added this paragraph regarding the apprehension of Hunter:

> Law enforcement maintained surveillance of the [Young Running Crane residence] while a search warrant was being prepared for the residence.  Surveillance units observed two male individuals leave the residence and begin walking away.  Law enforcement approached and attempted to make contact with both individuals, later identified as Cruz YOUNG RUNNING CRANE, aka Cruz GUZMAN, fled the area and law enforcement was unable to locate him.  Law enforcement did make contact with the other individual, who was identified as Daniel Hunter GUZMAN.  Law enforcement detected a strong odor of marijuana coming from Daniel GUZMAN's person.  A pat search was conducted for weapons and law enforcement detected a hard object inside Daniel GUZMAN's right pocket.  The item was retrieved and it was revealed to be a plastic baggie containing crystal methamphetamine that had an approximate gross weight of 8.1 grams.  They also located and seized from GUZMAN's person a baggie containing approximately 6.4 grams of marijuana, an electric scale with methamphetamine residue, $209 in cash, and a black LG brand cellular phone.  GUZMAN was placed under arrest and booked into the Minnehaha County Jail.  The evidence items located were bagged and identified and secured in the Sioux Falls PD evidence/ID section under CC# 16-76489.

See id.  All three requested search warrants for defendants' cellular phones were issued.  Id.

Justin and Chase were indicted in federal court on November 9, 2016, and charged with conspiracy to distribute 500 grams or more of methamphetamine.  See Docket Nos. 1, 2.  A superseding indictment was

issued January 19, 2017, adding Hunter to the drug conspiracy count, and asserting the additional charge against Chase of using and carrying a firearm in furtherance of a drug trafficking crime. See Docket Nos. 49, 50.

Defendants raise the following arguments in support of their motions to suppress the statements and physical evidence obtained by police in this case:

--the traffic stop and search of the van violated the Fourth Amendment (Justin, Chase & Hunter)

--Officer Christensen lacked legal authority to encounter Chase and order him to exit the van (Chase)

--the statements Justin made to Trooper Steen were in violation of Miranda (Justin)

--the statements Chase made to Agent Wiese should be suppressed as fruit of the poisonous tree of the illegal traffic stop (Chase)

--the items found in the execution of the state court search warrant should be suppressed as fruits of the poisonous tree of the Fourth Amendment violation (all three defendants)

--police lacked reasonable suspicion to stop Hunter and pat him down (Hunter)

The government responds that the traffic stop of the grey Dodge Grand Caravan was supported by both reasonable suspicion and probable cause to believe that its occupants were engaged in drug trafficking. Further, the government asserts neither Chase nor Hunter have standing to assert a constitutional challenge to the traffic stop. The government justifies the search of the van by relying on the plain view doctrine, pointing to Officer Christensen's observation of the baggie of marijuana near Chase's seat in the van. As to the search of the Young Running Crane trailer, the government asserts neither Chase nor Justin have standing to object to this search. As to

Hunter, the government argues even if the information from the traffic stop is excised from Agent Warkenthien's affidavit, the remaining facts in the affidavit nevertheless provide probable cause in support of the issuance of the search warrant.

The government also resists suppression of any statements. As to Justin, the government argues he was not in custody until after the search of the van, so that <u>Miranda</u> was not required prior to then. The government does not address the statements Justin made to Trooper Steen on the way to jail. As to Chase's statements, <u>Miranda</u> warnings were properly given and the statements themselves were voluntary. Thus, the government asserts there are no grounds to suppress Chase's statements.

Finally, as to the seizure of Hunter, the government asserts police had a reasonable, articulable suspicion that he was involved in criminal activity. Hence, the law allowed police to contact him and conduct a pat-down search. The evidence obtained from that search was obtained legally.

## DISCUSSION

### A.    Was the Stop of Justin and Chase's Van Justified?

The Fourth Amendment to the United States Constitution prohibits unreasonable searches and seizures. When a law enforcement officer stops a motor vehicle and questions its occupants, the stop constitutes a seizure under the Fourth Amendment, "even though the purpose of the stop is limited and the resulting detention quite brief." <u>Brendlin v. California</u>, 551 U.S. 249, 255-56 (2007); <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979); <u>United States v.</u>

Wheat, 278 F.3d 722, 726 (8th Cir. 2001). A stop results in a seizure under the Fourth Amendment of all occupants of the vehicle, driver and passengers. Brendlin, 551 U.S. at 255-56. A traffic stop may be lawfully made under two circumstances. If there is probable cause to stop the vehicle, such a stop is lawful. United States v. Sallis, 507 F.3d 646, 649 (8th Cir. 2007) (quoting Untied States v. Coney, 456 F.3d 850, 855-856 (8th Cir. 2006) (quoting United States v. Linkous, 285 F.3d 716, 719 (8th Cir. 2002))). Also, if there is reasonable suspicion to stop the vehicle, the stop complies with the Fourth Amendment. Navarette v. California, 572 U.S. ___, 134 S. Ct. 1683, 1687-88 (2014); United States v. Spotts, 275 F.3d 714, 718 (8th Cir. 2002); United States v. Bell, 183 F.3d 746, 749 (8th Cir. 1999).

Probable cause exists where the totality of the facts and circumstances are sufficient to lead a reasonable person to believe that the defendant has committed a crime. There need only be a probability or substantial chance of criminal activity, rather than an actual showing of criminal activity. United States v. Torres-Lona, 491 F.3d 750, 755-756 (8th Cir. 2007). There must be evidence which would "warrant a man of reasonable caution in the belief" that a crime has been committed. Wong Sun v. United States, 371 U.S. 471, 479 (1963).

An officer making a Terry[9] stop based upon "reasonable suspicion," "must be able to articulate something more than an 'incohate and unparticularized suspicion or "hunch." ' " United States v. Sokolow, 490 U.S. 1,

---

[9] Terry v. Ohio, 392 U.S. 1 (1968).

7 (1989).  Instead, police must have "a 'particularized and objective basis for suspecting the particular person of criminal activity." Navarette, 134 S. Ct. at 1687.

"Reasonable suspicion" in support of a Terry stop "is dependent upon both the content of information possessed by police and its degree of reliability." Id. (quoting Alabama v. White, 496 U.S. 325, 330 (1990)).  In evaluating the standard, courts must take into account "the whole picture," the "totality of the circumstances." Id. A mere "hunch" does not suffice, but the standard requires "considerably less proof of wrongdoing" than "preponderance of the evidence" or probable cause. Id. (quoting Sokolow, 490 U.S. at 7).  A traffic stop need not be based on the police officer's personal observation—it can be based on information supplied by a third party. Id. at 1688.  Even a single anonymous tip may provide the necessary reasonable suspicion if the indicia of reliability are sufficient—such as richness of detail, eyewitness observation, use of the 911 system to report the tip, and an absence of any reason to suspect the tipster had a motive to fabricate. Id.

"[T]he constitutional reasonableness of a traffic stop does not depend on the actual motivations of the officer involved, and the subjective intentions of the officer making the stop are irrelevant in determining the validity of the stop." United States v. Herrera-Gonzales, 474 F.3d 1105, 1109 (8th Cir. 2007). See also United States v. Andrews, 465 F.3d 346, 347 (8th Cir. 2006) (per curiam) ("[T]he fourth amendment is not violated if an objectively good reason for a traffic stop exists, whatever the actual subjective motive of the officer

making the stop may have been.").  Although a traffic violation can provide the basis for a <u>Terry</u> stop, there is no requirement that a traffic violation occur if there are other grounds providing the officer with a reasonable, articulable suspicion of criminal activity.  <u>United States v. Jacobsen</u>, 391 F.3d 904, 907 (8th Cir. 2004) (quoting <u>United States v. Mora-Higuera</u>, 269 F.3d 905, 909 (8th Cir. 2001)).

Both Justin and Chase argue in their supplemental briefs filed in this matter that law enforcement never identified who the occupants of the grey Dodge Grand Caravan were until *after* the traffic stop was conducted by Trooper Steen.  This assertion is not borne out by the record.  Agent Brent Fair testified he was familiar with what Justin looked like from the investigation prior to September 22:  (1) after the CI first contacted ATF agents obtained photos and showed them to the CI to verify that that "Speedy" was in fact Justin Morales; (2) Agents Fair and Warkenthien saw Morales during the controlled buy between Morales and the CI on April 20, 2016, near the Texas Roadhouse Restaurant in Sioux Falls; and (3) Agent Fair observed video stills taken from the CI's phone from video chats the CI had with Morales.  On the day of September 22, Agent Fair testified unequivocally that when he was conducting surveillance early in the day at the Days Inn hotel, he recognized Justin.  Furthermore, although Agent Fair did not recognize the second male accompanying Justin, other agents conducting surveillance at the Days Inn did

recognize Chase from photos and called that information out over the radio.[10]
Finally, the CI told Agents Fair and Warkenthien that the two males were
Justin and Chase. All of this information was known early in the morning on
September 22. The traffic stop occurred after 3 p.m. that day. Justin and
Chase were under surveillance wherever they moved on September 22. Thus,
police clearly knew the identities of the two occupants of the grey van long
before the traffic stop was conducted.

Defendants also assert that the registration information on the grey
Dodge Grand Caravan van and the blue Chevrolet Silverado pick-up truck was
not known until the following day, September 23, when ATF Agent Franklin
Gonzalez ran a records check. The "proof" defendants rely upon for this
assertion is that SA Gonzalez wrote a report detailing the registration
information and that report was dated September 23, 2016.

---

[10] Chase seeks to undermine Agent Fair's testimony in this regard by pointing
out Agent Fair could not recall which officer(s) made the identification of Chase.
With many police officers involved in the investigation of Chase and Justin on
September 22, and all of them communicating via radio with each other rather
than face-to-face, the court does not find Agent Fair's inability to name the
particular officer who made the identification significant. Det. Buiter testified
he identified Chase from his photo when he saw Chase.

Chase also seeks to muddy the waters by suggesting Det. Buiter testified
Chase had previously been involved in a controlled buy, whereas Agent Fair
testified Chase had not been previously involved. Det. Buiter actually testified
"three males . . .came out of the [Young Running Crane] trailer from another
operation we had been involved in, a controlled purchase." See Transcript at
p. 209, lines 8-10. Clearly Det. Buiter was wrong in saying the "three males"
were involved in the earlier controlled purchase. The third unidentified male
was unconnected to the drug events and was apparently just receiving a ride to
his job at Hardee's from Justin and Chase. The court finds Det. Buiter was
incorrect also in including Chase with his reference to the earlier drug buy.
This does not undermine Det. Buiter's identification of Chase from his photo.

However, Agent Fair specifically testified at the hearing that on his first trip to the Days Inn parking lot early in the morning on September 22 he called in the license plate numbers of the two vehicles bearing Kansas plates and Agent Warkenthien radioed the registration information back to Agent Fair. The fact that no written report was introduced into evidence dated September 22 documenting this event does not mean it did not happen. Agent Fair's testimony is corroborated by the affidavit Agent Warkenthien drafted on the day of the 22nd. Agent Warkenthien stated in that affidavit the same sequence of events that Agent Fair testified to. See Exhibit 1 at p. 4, ¶ 4. The court thus rejects defendants' assertion of fact that police did not know the registration information for the two Kansas vehicles until the day after the traffic stop.[11]

Evaluating the "whole picture," the totality of the circumstances known collectively to law enforcement prior to stopping the grey Dodge Grand Caravan, the court finds the traffic stop was supported by reasonable suspicion. Officers knew Justin and Chase were in the van, the CI had described them to be in possession of a pizza box containing drugs, police observed Justin obtaining something from the blue Chevrolet pick-up and placing it in the back of the van, surveillance at the trailer had documented the men carrying a white box, and the grey van's evasive and circuitous driving prior to the stop further added to the evidence that the occupants of the van were committing, or were about to commit, criminal acts. Furthermore,

---

[11] The government sought, obtained, and provided to defense counsel after the suppression hearing a copy of a law enforcement report dated September 22, 2016, documenting that the records check was run on that day as Agent Fair testified. See Docket No. 106 at pp. 6-7.

through the CI who was known to the ATF and who had proven himself to be reliable, police knew Justin had previously sold five ounces of meth to the CI, Justin had told the CI he had multiple pounds of meth and marijuana with him on this trip, he showed the CI a Glock pistol, and he told the CI the remaining stash of drugs was at the Young Running Crane trailer. The drug task force, prior to stopping Justin and Chase in the grey van, had more than a reasonable articulable suspicion that criminal activity was afoot. The court concludes the traffic stop was legal.

**B.      Was Officer Christensen Acting Legally by Encountering Chase?**

Chase argues Officer Jason Christensen violated his Fourth Amendment rights by coming up to the passenger side of the grey van and asking Chase to step out of the van. At the hearing, Officer Christensen was clear about the fact that the marijuana was *not* in plain view when Chase was in the van. It was only when Chase opened the passenger side door to step out of the van that Officer Christensen spied the baggie of marijuana in between the passenger front seat and the front passenger door. Thus, Chase argues, the marijuana was not in plain view so as to lead to probable cause to search the van (more about that below). The government relies on Maryland v. Wilson, 519 U.S. 408 (1997), for its assertion that, during a traffic stop, officers may order passengers out of an automobile.

In Wilson, a police officer turned on his lights and sirens to stop a vehicle for speeding. Wilson, 519 U.S. at 410. The driver kept driving for 1 ½ miles, during which time the officer saw three passengers, two of whom looked back

at the officer repeatedly and ducked below sight level and reappeared.  Id.
Upon stopping, the driver got out and met the officer midway between their
cars.  Id.  The officer noticed the front-seat passenger, Wilson, looked extremely
nervous and sweaty.  Id.  The officer ordered Wilson to get out of the car and,
when he exited, a quantity of crack cocaine fell to the ground.  Id. at 410-11.
Wilson was charged with possession with intent to distribute cocaine.  Id. at
411.  He moved to suppress, arguing that the officer unreasonably seized him
by ordering him out of the car.  Id.

The Court noted that when an officer stops a vehicle, it seizes the
passengers too, whether they remain in the car or are ordered to step outside
the car.  Id. at 413-15.  Thus, the difference to the passenger whether he is in
or out of the vehicle is "minimal."  Id. at 415.  The difference in safety to the
police officer conducting the stop, however, is substantial.  Id. at 413-15.

The "danger to an officer from a traffic stop is likely to be greater when
there are passengers in addition to the driver in the stopped car."  Id. at 414.
Analogizing from the situation involving execution of a search warrant, the
Court noted a search for drugs is "the kind of transaction that may give rise to
sudden violence or frantic efforts to conceal or destroy evidence."  Id. at 414
(quoting from Michigan v. Summers, 452 U.S. 692, 702-03 (1981)).  In such
situations, the safety of the police is maximized "if the officers routinely
exercise unquestioned command of the situation."  Id. (quoting Summers, 452
U.S. at 702-03).  In summary, the Court issued a black-and-white rule:  "[w]e
therefore hold that an officer making a traffic stop may order passengers to get

out of the car pending completion of the stop." Id. at 415. See also United States Phillips, 679 F.3d 995, 998 (8th Cir. 2012). This rule is not predicated on the officer observing any kind of suspicious behavior on the part of the passengers, although the passengers in Wilson did exhibit such behavior.

Clearly, because the court has concluded the traffic stop itself complied with Fourth Amendment standards, Officer Christensen did not exceed the limits of the Fourth Amendment by encountering Chase on the passenger side of the grey van and asking him to step out of the van. The court rejects this basis for suppression.

**C.    Was the Search of the Van Legal?**

**1.    The Search was Justified Under the Automobile Exception**

The usual rule under the Fourth Amendment is that a valid search warrant supported by probable cause must first be obtained before a search is conducted. California v. Carney, 471 U.S. 386, 390 (1985). There are, however, a number of exceptions to the warrant requirement, including the automobile exception and the plain view doctrine. Pennsylvania v. Labron, 518 U.S. 938, 940 (1996) (per curiam); United States v. Caves, 890 F.2d 87, 89 (8th Cir. 1989). The Supreme Court has held that the "ready mobility" of automobiles creates an exigency that allows a warrantless search of an automobile where probable cause exists to believe that the vehicle contains contraband or evidence of criminal activity. Labron, 518 U.S. at 940; Caves, 890 F.2d at 89. Aside from the mobility of cars, the automobile exception to the warrant requirement is also supported by the fact that citizens have a

reduced expectation of privacy in an automobile because automobiles are subject to pervasive regulation. Labron, 518 U.S. at 940 (citing Carney, 471 U.S. at 390-391); Caves, 890 F.2d at 89.

If probable cause exists in support of the automobile exception, the search may encompass the entire passenger compartment of the automobile, its trunk, and all containers, packages, and compartments located in the vehicle so long as there is probable cause to believe that the object of the search may be found there. Caves, 890 F.2d at 90. Probable cause requires "only a probability or substantial chance of criminal activity, not an actual showing of such activity." United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (citing United States v. Payne, 119 F.3d 637, 642 (8th Cir. 1997), (quoting Illinois v. Gates, 462 U.S. 213, 243-244 n.13 (1983))).

The presence of facts and circumstances that give rise to the inference that drugs or alcohol have been consumed in the vehicle itself or were or are stored there gives rise to probable cause to search a vehicle—the entire vehicle. United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000) (strong smell of air freshener emanating from the car); United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999) (odor of alcohol coupled with driver's admission of having drunk a beer 60 miles away from the scene of the stop); Caves, 890 F.2d at 91 (fact that driver still smelled of marijuana and had been riding in the car for several hundred miles). See also United States v. Jennings, 2007 WL 2142260, No. *1 (8th Cir. July 27, 2007) (unpublished) (per curiam) (holding that odor of burnt marijuana emanating from passengers and from interior of car justified

search pursuant to the automobile exception because probable cause existed to believe that marijuana had been used in the car).[12]  Here, Officer Christensen did not just *smell* marijuana, he actually saw it from a lawful vantage point. Hence the search of the van after seeing the marijuana was justified under the automobile exception.

## 2.    The Search was Justified Under the Plain View Doctrine

The government asserts the search of the grey van is also justified under the plain-view doctrine.  The Court in <u>Horton v. California</u>, 496 U.S. 128 (1990), explained the plain-view doctrine.  Because *any* evidence seized by the police will likely be in plain view, the plain-view doctrine may only be used to justify a warrantless seizure when the initial intrusion that brings the police within plain view of the items seized is supported by one of the recognized exceptions to the warrant requirement.  <u>Horton</u>, 496 U.S. at 135.  The plain-view doctrine does not stand alone, rather it works in conjunction with a prior justification for the lawful presence of the police at the place of the warrantless seizure.  <u>Id.</u> (citing <u>Coolidge</u>, 403 U.S. at 465-66).  That is, a police officer who comes across evidence while in hot pursuit of a fleeing suspect, while validly arresting a defendant, or while executing a valid search warrant for other objects may rely on the plain view doctrine to seize items in plain view that are

---

[12]Although the Eighth Circuit did not select <u>United States v. Jennings</u> for publication in the Federal Reporter, the Rules of Appellate Procedure provide that such decisions are nevertheless a proper subject for citation.  <u>See</u> Fed. R. App. P. 32.1.  The <u>Jennings</u> decision is cited because it is the only Eighth Circuit precedent where probable cause was held to emanate from an odor of drugs found on the occupants, rather than on the driver.

not covered by a warrant.  Id. at 135-36 (citing Coolidge, 403 U.S. at 465-66). If a police officer has some legitimate reason for being present that is *unconnected* with a search directed against the defendant, that is, an officer is not searching for evidence against the accused, then any incriminating objects in plain view may be seized without a warrant.  Id. at 135.

The plain-view doctrine, in order to be applicable, requires that the police officer be lawfully in the place where s/he is when s/he views the evidence.  Id. See also United States v. Morgan, 842 F.3d 1070, 1075 (8th Cir. 2016) (same). Also, the incriminating nature of the evidence must be immediately apparent to the officer.  Horton, 496 U.S. at 142; United States v. Khabeer, 410 F.3d 477, 482 (8th Cir. 2005).  Finally, the plain-view doctrine requires the government to show the officer had a lawful right to access the object.  Khabeer, 410 F.3d at 482.

Here, all three elements are met.  The Wilson holding shows that Officer Christensen was lawfully in the place where he was when he encountered Chase and asked him to step out of the van.  Once Chase stepped out, the marijuana was immediately seen by Officer Christensen in plain view and he immediately recognized it as marijuana.  Finally, because it is contraband to which no person may assert a lawful right of possession, Officer Christensen had a right to access the marijuana.  Once the contraband was discovered, it gave rise to probable cause to search the whole van.  Marijuana is not dubbed "the gateway drug" solely because it sometimes leads its consumers to trying more dangerous drugs.  It is a gateway also for police into the lives of those

found in possession of it.  The court concludes the search of the van was justified because there was probable cause to conduct the search either under the automobile exception to the warrant requirement or under the plain view doctrine.  This basis for suppressing evidence from the van is rejected.

**D.    Are Justin's Statements Admissible?**

Justin moves to suppress his statements made at the traffic stop as he asserts they were the product of custodial interrogation.  The holding of the Miranda case "is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."  United States v. Griffin, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)).  A Miranda warning is required prior to questioning whenever two conditions are present:  (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Justin was never given Miranda warnings prior to the questioning in this case.  The government suggests that Trooper Steen's questions were simply "conversational" and not interrogation.  The court rejects this suggestion.  Trooper Steen knew Justin was suspected of drug trafficking and he asked him

direct questions about whether he had any "dope" and why he had so much cash on his person. This is clearly direct questioning intended to elicit an incriminatory response from Justin. Thus, whether Justin's statements should be suppressed pursuant to the rule in the <u>Miranda</u> case depends on whether Justin was in custody at the time of his interrogation.

Some courts have placed the burden of proving that the defendant was not in custody at the time of the interrogation on the government. <u>See</u> <u>United States v. Charbonneau</u>, 979 F. Supp. 1177 (S.D. Ohio 1997). Other courts have placed the initial burden on the defendant to prove that he was "in custody," with the burden of proof shifting to the government to prove a voluntary waiver only after the defendant has sustained his initial burden. <u>See</u> <u>United States v. Moore</u>, 104 F.3d 377, 391 (D.C. Cir. 1997). The Eighth Circuit appears not to have addressed this issue yet, although some district courts within the circuit have. <u>See e.g.</u> <u>United States v. Morriss</u>, 2006 WL 3519344 (W.D. Mo. 2006) (placing initial burden on defendant and citing to extra-circuit cases for authority). For purposes of this report and recommendation, the court has placed the burden of proving that Justin's statements were *not* the subject of custodial interrogation on the government.

The Supreme Court in <u>Berkemer v. McCarty</u>, 468 U.S. 420 (1984) addressed the issue of whether a motorist who is the subject of a traffic stop is "in custody" for purposes of <u>Miranda</u>. After the motorist is formally arrested on a traffic violation, no matter how minor, the Court held that <u>Miranda</u> warnings are required. <u>Berkemer</u>, 468 U.S. at 434-435. However, during the traffic stop

itself and prior to arrest, the Court held that Miranda applies only when and if the "suspect's freedom of action is curtailed to a 'degree associated with formal arrest.' " Id. at 440-441 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983) (per curiam)).

The Court acknowledged that a traffic stop "significantly curtails the 'freedom of action' of the driver and the passengers" in the detained vehicle, noting that drivers who see a policeman's signal neither feel free to ignore that signal nor to drive away, once stopped. Id. at 436. However, a traffic stop is generally devoid of those elements of coercion that prompted the announcement of the rule in Miranda. Id. at 436-438. For example, the detention is presumptively temporary and brief, with the driver being allowed to continue on his way after a check of his license and registration and, perhaps, the issuance of a citation. Id. at 437. Also, the interrogation takes place in public, subject to observation by pedestrians and other vehicles, thus reducing the ability of an unscrupulous policeman to "use illegitimate means to elicit self-incriminating statements and diminish[ing] the motorist's fear that, if he does not cooperate, he will be subjected to abuse." Id. at 438. Thus, the Court concluded that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of Miranda." Id. at 440.

The Berkemer Court directed courts to consider factors such as the following in determining whether a suspect at a traffic stop was "in custody" such that Miranda warnings were required: period of time elapsed between the

traffic stop and the arrest, whether the suspect was informed his detention was only temporary or that he was not under arrest, and the character and nature of the interaction between the police and the suspect at the stop. Id. at 441-42.

The test of whether a suspect is "in custody" is one of objective reasonableness judged from the point of view of the suspect, not from the point of view of the interrogator. Berkemer, 468 U.S. at 442; United States v. Black Bear, 422 F.3d 658, 661 (8th Cir. 2005); Griffin, 922 F.2d at 1347; Carter, 884 F.2d at 370. In determining whether a suspect reasonably believed himself or herself to be in custody, the court examines the totality of the circumstances. Carter, 884 F.2d at 370 (citing United States v. Lanier, 838 F.2d 281, 285 (8th Cir. 1988) (per curiam)).

Under the totality of the circumstances test, six nonexclusive factors have emerged with some frequency: (1) whether the suspect was informed that he was free to leave and that answering the interrogator's questions was voluntary; (2) whether the suspect possessed freedom of movement during the interrogation; (3) whether the suspect initiated contact with the interrogator or voluntarily acquiesced in the interrogation; (4) whether the interrogator employed strong-arm tactics or strategies; (5) whether the atmosphere of the interrogation was dominated by the police; and (6) whether the suspect was arrested at the close of the interrogation. See United States v. Flores-Sandoval, 474 F.3d 1142, 1146-1147 (8th Cir. 2007) (citing Griffin, 922 F.2d at 1349). Reference to these factors is helpful, but these factors are not exclusive and

custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." Flores-Sandoval, 474 F.3d at 1147. In addition, the place where the interrogation took place, the purpose of the interrogation, the length of the interrogation, and other factors are also to be considered. Griffin, 922 F.2d at 1348; Carter, 884 F.2d at 370.

In United States v. Czichray, 378 F.3d 822, 827 (8th Cir. 2004), the Eighth Circuit cautioned the Griffin factors are by no means exhaustive and should not be applied "ritualistically." The Court emphasized "an express advisement that the suspect is not under arrest and that his participation is voluntary" is the most obvious and effective means of demonstrating he has not been taken into custody. Id. at 826. The Eighth Circuit regards the twin admonitions that the suspect is free to leave and does not have to answer questions to be "weighty in the custody analysis." United States v. Perrin, 659 F.3d 718, 720-21 (8th Cir. 2011). The Griffin factors still appear in Eighth Circuit case law after Czichray, and continue to be cited with approval for determining the custody issue. See id.

The Eighth Circuit discussed the application of Berkemer to a traffic stop in United States v. Morse, 569 F.3d 882 (8th Cir. 2009). In that case, police stopped the vehicle in which Morse was a passenger. Id. at 883. The driver was arrested for driving with a suspended license and the officer asked Morse to exit the vehicle so as to conduct a search of the vehicle incident to arrest. Id. When Morse exited, the officer told Morse he was going to conduct a pat-

down search and asked Morse if he had anything on his person the officer should know about.  Id.  At that point, Morse told the officer he had crack cocaine in his pocket.  Id.  Morse later moved to suppress his statement and the fruits of the officer's search of his person because the interrogation by the officer was without benefit of <u>Miranda</u> warnings.  Id.

The district court granted the motion to suppress, declining to apply the holding of <u>Berkemer</u> because the district court held that "the questioning of [Morse] was not in connection to the reason for the stop and far exceeded a routine roadside questioning."  Id. at 884.  The Eighth Circuit reversed, holding that <u>Berkemer</u> controlled the analysis.  Id. at 884-85.  The court held that, under <u>Berkemer</u>, the mere fact that Morse did not feel free to leave was not determinative of whether <u>Miranda</u> warnings were required.  Id.  In addition, the court noted that Morse was asked only a "modest number of questions" and the facts did not establish a situation tantamount to a formal arrest.  Id.

In <u>United States v. Rodriguez</u>, 711 F.3d 928, 935 (8th Cir. 2013), the court also found the defendant was not in custody during questioning at a traffic stop.  The facts in that case were the defendant was stopped after police observed his vehicle had no license plates and the registration had expired.  Id. at 933.  As the police officer approached Rodriguez's car, he saw a television and speakers in the back seat.  Id.  Rodriguez told the officer his driver's license was suspended, but gave him his date of birth.  Id.  The vehicle was not registered either to Rodriguez or his passenger.  Id.  The officer returned to his patrol car to run a records search, leaving the two men in Rodriguez's car.  Id.

While seated in his patrol car, the officer saw Rodriguez and the passenger reaching for the floorboard and looking back at the officer. Id. The records check revealed the car was registered to a third party and there was a possible felony arrest warrant outstanding for Rodriguez. Id.

Fearing for his safety, the officer called for backup. Id. When assistance arrived, the officers ordered Rodriguez out of his car. Id. The officer asked Rodriguez what he had been reaching for and Rodriguez told the officer there was a handgun in the center console. Id. The officer then handcuffed Rodriguez for officer safety, but told Rodriguez he was *not* under arrest. Id. The officer then put Rodriguez into his patrol car. Id. The officer asked Rodriguez if there was any other contraband in his car, and Rodriguez admitted there was a methamphetamine pipe under the driver's seat. Id. The second officer similarly handcuffed the passenger and placed the passenger into a separate patrol car. Id.

On appeal, Rodriguez argued he was "in custody" for purposes of Miranda as soon as the officer ordered him to exit his vehicle. Id. at 935. The issue of whether Rodriguez was "in custody" when he was handcuffed and seated in the back of the officer's patrol vehicle was not raised, briefed or argued on appeal. Id. at 935 n.2. As to the issue of whether Rodriguez was "in custody" at the moment he was ordered to exit his car, the court held he was not. Id. at 935. At that moment, the officer had legitimate concerns for his own safety because of the reach for the floorboards, the nature of the car was suspicious (no license plates and registered to a third party with different last

43

name than either Rodriguez or his passenger), and there was a possible felony warrant for Rodriguez, from whom the officer had not received any form of identification.  Id.  Under these circumstances, the court held the officer was justified under Berkemer and Terry in removing Rodriguez from the car and securing him while the officer investigated further.  Id.

Here, Trooper Steen readily agreed that, from the moment Justin pulled his van over, neither Justin nor Chase were free to leave.  But the question is not what was in the mind of the police at the time.  The question is what a reasonable person would have thought from Justin's perspective.

Justin was not formally arrested until after the search of the van.  But he was handcuffed and placed in the back of Trooper Steen's patrol vehicle right after Officer Christensen told Trooper Steen about the discovery of the baggie of marijuana.  But the discovery of the baggie of marijuana was found even earlier than that.  The baggie was discovered in full view of Justin and Trooper Steen before Trooper Steen and Justin began any discussions at all—it was discovered as soon as the two settled into the front seats in Trooper Steen's patrol vehicle.  This discovery sounded the death knell for Justin's liberty.  Justin knew this.  Any reasonable person in Justin's place would know it.

Other factors support this conclusion.  An ordinary reasonable person in Justin's circumstances would understand that the discovery of the baggie removed this traffic stop from that category of routine stops described in Berkemer wherein the motorist is not free to leave, but knows that his or her detention will be brief.  Here, once the baggie was found, Justin knew his

detention would eventually turn into an arrest.  In fact, he was arrested at the end of the search, another factor favoring a finding that Justin was in custody.

At no time during the traffic stop on September 22 did Trooper Steen tell Justin explicitly "you are not under arrest," or "we are keeping you only temporarily."  As the Eighth Circuit has said, if police want a suspect to know he is not under arrest, the most obvious and effective method is to tell him that.  Czichray, 378 F.3d at 826.  Tropper Steen did not tell Justin he was not under arrest or that he was not going to be arrested.  That is because Trooper Steen knew Justin would be arrested from the inception of the traffic stop, a fact Justin also knew once the baggie was found.

Even though Justin did not testify at the hearing, we know this is what he was thinking because after Trooper Steen spoke to Officer Christensen about finding the marijuana in the van, Trooper Steen asked Justin when he was going back to Kansas.  Justin answered that there was "no telling now," meaning he knew he would be arrested.  Trooper Steen did not testify about whether he knew of Officer Christensen's discovery of the marijuana contemporaneously with that discovery or whether he learned of the discovery only when Officer Christensen verbally told him.  However, again, the inquiry is whether Justin—or, rather, a reasonable person in Justin's position—would feel he was no longer free to leave.  Justin clearly watched the events unfold before him, saw Chase handcuffed as soon as he exited the van, and saw Officer Christensen remove the baggie of marijuana from the van.  Since this was not Justin's "first rodeo," he clearly knew he was going to be arrested at

this point. In addition, mid-way through the traffic stop, Trooper Steen handcuffed Justin and moved him from the front seat of the patrol car to the rear seat of the patrol car. This was a clear signal to Justin, even if the prior events had not happened, that he was not free to leave. The court concludes Justin was in custody as soon as he saw Officer Christensen pull the baggie of marijuana from the front passenger area of the van.

During the first discussion between Trooper Steen and Justin, Trooper Steen was clearly interrogating Justin. He was posing direct questions intended to elicit an incriminating response, including the questions whether Justin and Chase had any dope in the van and why Justin had "so much money" on his person. In is undisputed that no <u>Miranda</u> advisements were given to Justin prior to this interrogation. For the period from 15:10:50, when Officer Christensen pulled the baggie of marijuana from the van, until 15:33:30, the court recommends suppressing all of Justin's statements as they were obtained in violation of the rule in <u>Miranda</u>.

Not so, however, for the later conversation which occurred on the way to the police station. There was a long period where Trooper Steen and Justin did not speak to each other while Trooper Steen was helping Officer Christensen search the van thoroughly and then while Trooper Steen was first transporting Justin to the police station. This silence was broken by Justin, not Trooper Steen, at 15:33:36 mid-way on the way to the police station. From this point forward on Exhibit B, it can fairly be said that *Justin* was interrogating Trooper Steen rather than the reverse. Although it is true that <u>Miranda</u> warnings still

had not been given to Justin, <u>Miranda</u> is directed only to *police interrogations*. Voluntary statements made by a subject in the absence of interrogation are not subject to the rule in <u>Miranda</u>. <u>Griffin</u>, 922 F.2d at 1356-57. Since these statements made by Justin at the end of Exhibit B (from 15:33:36 until the end of Exhibit B) were voluntary statements and not in response to any interrogation by Trooper Steen, the court recommends these statements by Justin be admissible.

**E.      Are Chase's Statements Admissible?**

No statements were made by Chase until he was at police headquarters, had been advised of his <u>Miranda</u> rights, and waived those rights. The only ground asserted by Chase for suppression of his statements is that they are "fruit of the poisonous tree" of the illegal traffic stop and Officer Christensen's illegal contacting of Chase and ordering him to get out of the van. Because the court has ruled that the these events were legal and did not violate Chase's Fourth Amendment rights, the court rejects Chase's argument that his statements are tainted by any Fourth Amendment violation. There was, in this court's view, no such violation. No other grounds are asserted by Chase for the suppression of his statements. The court recommends Chase's motion to suppress his statements be denied.

In the event a subsequent court reviewing this court's opinion as to the asserted Fourth Amendment violations reaches a different conclusion, the court addresses whether the "taint" of the Fourth Amendment violation (if one occurred) was purged. The Supreme Court explained in <u>Wong Sun v. United</u>

States, 371 U.S. 471, 488 (1963), not all evidence which derives from a constitutional violation is "fruit of the poisonous tree" of the original violation. Instead, in determining whether the fruit (i.e. the evidence which is the target of the suppression motion) is "tainted" and must therefore be excluded, courts should evaluate whether police obtained the fruit by exploiting the constitutional violation, or whether they obtained it by means distinguishable enough from the original violation to "purge" the primary taint. Id.  The Supreme Court expounded upon this concept recently, stating "even when there is a Fourth Amendment violation, th[e] exclusionary rule does not apply when the costs of exclusion outweigh its deterrent benefits." Utah v. Strieff, 579 U.S. ___, 136 S. Ct. 2056, 2059 (2016).  This is because sometimes, "the link between the unconstitutional conduct and the discovery of the evidence is too attenuated to justify suppression."

In Strieff, an officer made an illegal Terry stop of Strieff because he did not have reasonable suspicion to support the stop. Strieff, 136 S. Ct. at 2060. During the illegal stop, the officer discovered that there was a valid, active warrant outstanding for Strieff's arrest. Id.  The officer arrested Strieff and, during a search incident to arrest, discovered methamphetamine and paraphernalia on Strieff's person. Id.  Strieff moved to suppress the drugs and paraphernalia as fruit of the poisonous tree of the illegal Terry stop. Id.

The Court outlined three exceptions to the fruit of the poisonous tree doctrine:

> (1) independent source doctrine where evidence from an illegal search is admissible if acquired from a separate, independent source;
>
> (2) inevitable discovery where illegally obtained evidence is admissible if it would have been discovered even without the unconstitutional source;
>
> (3) attenuation doctrine where the connection between the constitutional violation and the evidence is remote or has been interrupted by an intervening circumstance.

Id. at 2061.

In applying the third exception in Strieff, the Court evaluated the factors set forth in Brown v. Illinois, 422 U.S. 590 (1975): (1) the temporal proximity between the constitutional violation and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the police conduct. Id. at 2061-63. Temporal proximity strongly favored suppression because the evidence was discovered only minutes after the constitutional violation and the Court held usually "substantial time" must elapse between the two events. Id. at 2062. The second factor strongly favored admissibility of the evidence as the arrest warrant was valid, it predated the Terry stop, it was entirely unconnected with the Terry stop, and, once the officer discovered the existence of the warrant, he was mandated to execute it. Id. Once the officer arrested Strieff, it was incumbent upon the officer to conduct a search of Strieff's person incident to arrest to ensure officer safety. Id. at 2063. The third factor also favored admissibility because the officer's conduct was, at most, negligent in violating Strieff's rights rather than purposefully and flagrantly illegal. Id. Also, there was no indication that the

officer's conduct was part of a pattern of systemic or recurrent police misconduct. Id.

In Wong Sun itself, there was a Fourth Amendment violation when Wong Sun was arrested without probable cause. Wong Sun, 371 U.S. at 491. He made a confession several days later, which he argued should be suppressed as fruit of the Fourth Amendment violation. Id. The Court rejected this argument and ruled his statement admissible. Id. at 491-92. The connection between the Fourth Amendment violation and the statement had "become so attenuated as to dissipate the taint." Id. at 491.

Here, we do not have the exact time Chase's statements were made. However, from Exhibit B, we can surmise that at least one hour elapsed between the traffic stop and the interrogation of Chase at the police department. The officers who interrogated Chase—Agents Wiese and Gonzales—were not present at the traffic stop and did not search the van. These officers administered Miranda warnings and obtained Chase's waiver of those warnings before embarking on the interrogation. Finally, the interrogation took place in a different physical setting than the alleged Fourth Amendment violation. Under these circumstances, the court concludes the taint from the original alleged Fourth Amendment violation had been purged.

The giving of Miranda advisements—alone--is not sufficient to purge the taint of a Fourth Amendment violation. Brown, 422 U.S. at 602. But it is an "important, although not dispositive," factor. Rawlings v. Kentucky, 448 U.S. 98, 107 (1980). The temporal proximity of the alleged illegal search and the

giving of the statement is not dispositive in this case either—one hour is not a great deal of time, but it also did not follow directly on the heels of the search. The different location and different officers conducting the subsequent interrogation, as well as the <u>Miranda</u> warnings themselves, are intervening factors. Finally, there is no evidence that the Fourth Amendment violation, if one did occur, was a purposeful violation, flagrant police misconduct, or part of a pattern of systemic police misconduct.

The Eighth Circuit held under similar circumstances that the taint of an illegal search of a defendant's person was purged when he was interviewed a short time after the search, but in a different location, by a different officer, and after advisement of <u>Miranda</u> rights, which the defendant acknowledged he understood and waived. <u>See</u> <u>United States v. Riesselman</u>, 646 F.3d 1072, 1078-79 (8th Cir. 2011). This court similarly holds the taint of any Fourth Amendment violation that may have occurred was purged so as to make Chase's statements admissible.

## F. The Search of the Young Running Crane Trailer Home

All three defendants urge that the evidence seized as a result of the search of the Young Running Crane trailer should be suppressed. This search was pursuant to the state court search warrant obtained by Agent Warkenthien. Justin and Chase argue the search was invalid as "fruit of the poisonous tree" of the Fourth Amendment violation they assert occurred at the traffic stop. Hunter alleges the search was invalid. The government argues

none of the defendants have standing to challenge the search of the Young Running Crane trailer.

### 1.    Standing

The government argues that Justin and Chase never stayed at the Young Running Crane trailer and thus have no reasonable expectation of privacy and, hence, no standing. Justin and Chase rely for standing on the "fruit of the poisonous tree" concept, asserting that if they have standing to challenge the traffic stop, they have standing to challenge any searches derivative of that stop.

As to Hunter, the government relies on <u>Minnesota v. Carter</u>, 525 U.S. 83 (1998), to argue he does not have standing either.  Hunter asserts <u>Carter</u> is inapposite and the case of <u>Minnesota v. Olson</u>, 495 U.S. 91 (1990), is controlling and confers standing on him.

### a.    Hunter's Standing

One may not claim Fourth Amendment protections unless one has a legitimate expectation of privacy in the place searched.  <u>Olson</u>, 495 U.S. at 95. "A subjective expectation of privacy is legitimate if it is 'one that society is prepared to recognize as reasonable.' "  <u>Id.</u> at 95-96 (quoting <u>Rakas v. Illinois</u>, 439 U.S. 128, 143-44 (quoting <u>Katz v. United States</u>, 389 U.S. 347, 361 (1967))).  In <u>Olson</u>, the Court held that "Olson's status as an overnight guest [in the home searched] is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable." <u>Id.</u> at 96.  The Court rejected Minnesota's assertion that Olson had to prove the place

searched was his "home" in order to have a legitimate expectation of privacy there.  Id.  The Court also rejected other *per se* tests for whether an overnight guest has a legitimate expectation of privacy such as whether the guest had a key, could exclude others, or had dominion and control over the premises when the host was absent.  Id. at 96-100.

Rather, the Court noted that staying overnight in another's home is a common practice and that we will all be guest and host many times in our lives.  Id.  We are at our most vulnerable when we are asleep, which is why we choose not to sleep in public places if at all possible, and instead seek shelter inside the home of another if ours is not available.  Id.  Thus, the court held Olson's expectation of privacy was "rooted in 'understandings that are recognized and permitted by society.' "  Id. at 100 (quoting Rakas, 439 U.S. at 144 n. 12).

In Carter, the defendants had come to the apartment of another person for the sole purpose of packaging cocaine.  Carter, 525 U.S. at 471.  They paid the lessee of the apartment one-eighth of an ounce of cocaine for this use.  Id. at 471-72.  The two defendants were in the apartment for only 2 ½ hours and had not stayed overnight.  Id.  The Court held the two defendants had no legitimate expectation of privacy in the search of the apartment:  they were there solely for a business transaction, they were in the apartment only a few hours, and there was no suggestion they had a previous relationship with the apartment lessee.  Id. at 473-74.

Here, this court concludes Hunter had a legitimate expectation of privacy in the trailer of Jerri Young Running Crane. Hunter and Jerri were brother and sister. Hunter had spent the night at Jerri's trailer sleeping. They had socialized with each other the evening before they went to bed. Jerri trusted Hunter to remain in her trailer when she left for work the next day. And, although Hunter brought drugs into the trailer, there is no evidence Jerri knew this fact. Hunter had contacted Jerri in advance and secured her permission to stay overnight. Thus, there was an overnight stay; Hunter was in the home for probably mixed reasons, some business and some personal; and he had a personal relationship with Jerri. These facts are more similar to the facts in Olson than in Carter.

### b. Justin and Chase

Under the Carter and Olson decisions discussed above, Justin and Chase did not have a legitimate expectation of privacy in the Young Running Crane trailer. When Jerri found out that Hunter was accompanied by Justin and Chase, she was dismayed and did not extend an invitation for them to sleep at her house. Both Justin and Chase had spent the night at a hotel. Although they accessed the Young Running Crane trailer, it was only for brief periods of time. Although Justin and Chase are related to Jerri, they are not her siblings. The reasons they accessed the trailer were primarily to obtain stores from their stash of drugs. Hence, their connection to the trailer was primarily commercial, like the two defendants in Carter.

But Justin and Chase do not rely upon the legitimate-expectation-of-privacy rubric to establish their right to challenge the search of the Young Running Crane trailer.  Rather, they assert a derivative standing.  They allege the search of the trailer was "fruit of the poisonous tree" of the Fourth Amendment violation that allegedly took place when they were stopped by Trooper Steen.  Justin and Chase assert that, so long as they had standing to object to the traffic stop, they have derivative standing to object to any subsequent searches which are the fruits of that Fourth Amendment violation.  The government does not address this derivative-standing argument.

Justin cites a Ninth Circuit case, <u>United States v. Santa Maria</u>, 15 F.3d 879, 883 (9th Cir. 1994).  But that case contains no discussion of defendants' assertion of a derivative-standing argument.  Indeed, the court noted that the government never argued directly that Santa Maria had no expectation of privacy in a trailer that was searched.  <u>Id.</u>  Chase cites <u>Murray v. United States</u>, 487 U.S. 533, 542 (1988).  However, <u>Murray</u> also does not establish a doctrine of derivative-standing.  Rather, the portion of the opinion cited by Chase discusses whether the independent source doctrine applies in that case.  Both cases have to do with whether the taint of a Fourth Amendment violation has been purged, not with standing.  The court concludes neither Justin nor Chase have Fourth Amendment standing to object to the search of the Young Running Crane trailer.  They can argue that the search warrant was "fruit of the poisonous tree" of the allegedly illegal traffic stop, but they have no other

grounds upon which to urge that the search of the trailer home was violative of the Constitution.

**2.      Validity of the Search of the Trailer House**

All three defendants argue the search of the Young Running Crane trailer home was illegal.  Justin and Chase argue the search warrant would not have been issued but for the allegedly illegal traffic stop.  Thus, they argue the search warrant and the evidence it revealed are "fruit of the poisonous tree" of the illegal traffic stop.  Hunter argues the traffic stop was illegal and, more specifically, that the "independent source doctrine" cannot apply to save the evidence obtained from the search warrant from the exclusionary rule.  None of the defendants argue that the search warrant affidavit is facially lacking in probable cause.

All of these arguments depend upon a finding that the traffic stop violated the Fourth Amendment.  The court has already concluded to the contrary.  That alone dispenses with all three defendants' arguments.  However, again, for the sake of reviewing courts which may not agree with that conclusion, the court addresses defendants' arguments.

As discussed above, even if a Fourth Amendment violation occurred, exclusion of the evidence obtained from the trailer house is not automatic.  Strieff, 136 S. Ct. at 2059.  Instead, the court must evaluate whether the search warrant for the trailer home was issued because police exploited the original constitutional violation or, whether the search warrant was obtained

by means distinguishable enough from the original violation to "purge" the taint. <u>Wong Sun</u>, 371 U.S. at 488.

The independent source doctrine is an exception to the exclusionary rule when there has been an illegal search. <u>United States v. Swope</u>, 542 F.3d 609, 613 (8th Cir. 2008). The exception applies when the government "shows that the evidence was acquired through a source independent of the taint." <u>Id.</u> The question in this case is whether the search warrant is an independent source for the physical evidence acquired from the trailer house. <u>Id.</u> The court must ask two questions: (1) would the police have applied for the search warrant of the trailer home had the traffic stop and evidence learned therefrom been unknown to police; and (2) excising the tainted information from the search warrant, does the affidavit in support of the search warrant still support a finding of probable cause. <u>Id.</u> at 614.

### a. Would Police Have Applied for the Warrant Anyway?

The answer to this question is pretty simple: Agent Fair testified that Agent Warkenthien went back to the office to begin typing up the search warrant *before* the traffic stop had occurred, and certainly *before* the marijuana was found in the subsequent search of the grey van. Thus, although Agent Warkenthien found out the facts from the traffic stop by listening to the information sent out over the radio, and incorporated those facts into his affidavit, nevertheless he had already evinced his intent to apply for a search warrant for the Young Running Crane trailer.

### b. Whether the Affidavit Established Probable Cause Without Information from the Traffic Stop?

The information from the four corners of the affidavit, minus any information from the traffic stop, established the following. On September 22, a CI who was known to ATF and had proven reliable in the past, told ATF that Justin had brought two pounds of meth and three pounds of marijuana to Sioux Falls to be distributed in Sioux Falls and the surrounding area. See Exhibit 1 at p. 3, ¶ 3. The CI told ATF that Justin and Chase were staying at the Days Inn off of 41st Street in Sioux Falls. Id.

ATF verified that there was a grey Dodge Grand Caravan with Kansas license plates parked in the Days Inn parking lot which was registered to Jacqueline Ann Morales. Id. at p. 4, ¶ 4. ATF verified there was also a blue Chevy Silverado pickup with Kansas license plates in the Days Inn parking lot which was registered to Chase. Id. ATF also verified that Chase had been a registered guest at the Days Inn, but had checked out the morning of September 22. Id. at p. 5, ¶ 7.

The affidavit further stated that the Sioux Falls Area Drug Task Force (SFADTF) had surveilled the vehicles and observed two individuals carrying a small white box get into the grey van. Id. at p. 4, ¶ 5. The van drove to the Young Running Crane trailer house. Id. The two individuals then went into the house at approximately 1:38 p.m. Id.

The affidavit stated that SFADTF also surveilled the trailer house on September 22. Id. at ¶ 6. Two individuals were observed exiting the trailer house at approximately 3:20 p.m. and getting into the grey van. Id. The

affidavit stated that, in Agent Warkenthien's experience, drug traffickers commonly maintain contraband, drugs, and drug sale proceeds in secure locations within their residence or vehicle for ready access.  Id. at pp. 5-6, ¶¶ 10-11.

"When the affidavit supporting the search warrant sets forth facts sufficient to create a fair probability that evidence of a crime will be found in the place to be searched, probable cause exists."  United States v. McIntyre, 646 F.3d 1107, 1115 (8th Cir. 2011) (quoting Unites States v. McArthur, 573 F.3d 608, 613 (8th Cir. 2009) (quoting United States v. Terry, 305 F.3d 818, 822 (8th Cir. 2002))).  See also Illinois v. Gates, 462 U.S. 213, 238 (1983). "Probable cause requires only a showing of fair probability, not hard certainties."  United States v. Hudspeth, 525 F.3d 667, 676 (8th Cir. 2008). Whether a search warrant is supported by probable cause is to be determined by considering the totality of the circumstances.  United States v. Grant, 490 F.3d 627, 632 (8th Cir. 2007).  The issuing judge's determination of the issue of probable cause should be paid "great deference."  United States v. O'Dell, 766 F.3d 870, 873 (8th Cir. 2014).

Reviewing courts examine the sufficiency of an affidavit in support of a search warrant using "common sense" and not using a "hypertechnical" approach.  Grant, 490 F.3d at 632 (citing United States v. Solomon, 432 F.3d 824, 827 (8th Cir. 2005) (quoting United States v. Williams, 10 F.3d 590, 593 (8th Cir. 1993))).  "Where the [issuing judge] relied solely upon the supporting affidavit to issue the search warrant, only that information which is found

within the four corners of the affidavit may be considered in determining the existence of probable cause." O'Dell, 766 F.3d at 874. See also Hudspeth, 525 F.3d at 674; United States v. Olvey, 437 F.3d 804, 807 (8th Cir. 2006).

A defendant seeking to suppress evidence obtained under a regularly issued search warrant has the burden to show by a preponderance of the evidence that the search warrant was not supported by probable cause. United States v. Chaar, 137 F.3d 359, 363 (6th Cir. 1998); United States v. De La Fuente, 548 F.2d 528, 534 (5th Cir). Cf. Carter v. United States, 729 F.2d 935, 940 (8th Cir. 1984) (generally, burden is on the defendant who moves to suppress evidence except where the search was without benefit of a search warrant).

Here, the affidavit when excised of any information from the traffic stop, was bare bones. It did not include a wealth of other details known to Agent Warkenthien, such as the CI's prior controlled buy from Justin, the fact the CI told the officers that the drugs were in the box Justin and Chase carried with them into the grey van, the fact that Justin had told the CI the drugs were being stored at the Young Running Crane trailer and that Hunter was there to guard them. The court concludes the affidavit, as excised, does establish probable cause, however.

Applying "great deference" to the state circuit court's determination that probable cause existed, the court notes the following. In the affidavit, the "two individuals" who were seen getting into the grey Kansas van with the white box, driving to the trailer, going into the trailer, and then coming back out and

getting into the van again were never identified.  And they were never identified to be the same two men throughout.

Nevertheless, using "common sense" and not using a "hypertechnical" approach, the inference that these "two individuals" were the same individuals being described throughout paragraphs 5 and 6 of the affidavit is a reasonable inference.  Agent Warkenthien stated that drug traffickers usually keep their drugs and money in a secure location such as a residence or vehicle close by to them.  Agents knew that Justin and Chase had already checked out of the Days Inn.  Therefore they must have had their drugs—a substantial amount— in a secure location.  There was "probable cause" to believe that location was the Young Running Crane trailer after Justin and Chase went there and stayed for approximately two hours.  Thus, the excised search warrant affidvait just barely gives support to a "fair probability" that evidence of drug trafficking would be found in the trailer.

### 3.  __Leon__ Good Faith

The government also seeks to support the search of the Young Running Crane trailer under the __Leon__ good faith exception. Even if an affidavit in support of a search warrant fails to provide probable cause for the issuance of the search warrant, the fruits of the search will not be suppressed if the officer who executed the search warrant relied upon that warrant in objective good faith.  United States v. Ross, 487 F.3d 1120, 1122-1123 (8th Cir. 2007) (describing good-faith exception pursuant to  United States v. Leon, 468 U.S. 897, 921, (1984)).  "When assessing the good faith of the officers, [the court]

look[s] to the totality of the circumstances, including any information known to the officers, but not included in the affidavit." United States v. Rodriguez, 484 F.3d 1006, 1011 (8th Cir. 2007). The question is whether a reasonably well-trained officer would have known that the search was illegal despite the issuing judge's authorization. Hudspeth, 525 F.3d at 676.

The Leon good-faith exception does not apply in four circumstances: (1) where the affidavit in support of the search warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," (2) when "the issuing magistrate wholly abandoned his judicial role," (3) when the warrant is "so facially deficient . . . that the executing officers cannot reasonably presume it to be valid," and (4) when the issuing magistrate was misled by false information in an affidavit that the affiant knowingly or recklessly included. Leon, 468 U.S. at 923 (citations omitted); United States v. Pruett, 501 F.3d 976, 980 (8th Cir. 2007), vacated and remanded on other grounds, 552 U.S. 1241 (2008)[13]; Ross, 487 F.3d at 1122.

The Eighth Circuit found the first exception applicable in United States v. Herron, 215 F.3d 812, 814-15 (8th Cir. 2000). In that case, law enforcement had drafted an affidavit focused on providing probable cause to search Buck's residence and farm for evidence of cultivation of marijuana. Id. at 813-14. Then, without altering the affidavit, they submitted the same facts in support of a request for a search warrant for Herron's residence and farm. Id. The only

---

[13]The Supreme Court vacated the holding in Pruett as to what constitutes "use" of a firearm during a drug trafficking crime.

facts alleged in the affidavit regarding Herron was that he had past convictions for cultivating marijuana, he was Buck's relative, and Buck had been observed at Herron's residence four months earlier, on which occasion he stated he was there to help Herron harvest corn.  Id.  The government conceded on appeal that the search warrant for Herron's farm lacked probable cause, but urged the application of the Leon good faith exception.  Id. at 814.  The Eighth Circuit refused to apply Leon, noting that the deficiencies in the Herron affidavit were not technical legal deficiencies, but rather a complete absence of facts probative of finding marijuana at Herron's place.  Id. at 814-15.

The Herron case is distinguishable here.  In Herron, the affidavit noted the suspect had been at the relative's house (where marijuana was suspected of being grown) *four months* prior.  Here, the CI said Justin and Chase had the drugs with them in Sioux Falls on the day of the search warrant application and they visited the Young Running Crane trailer *that same day.*

Here, none of the defendants assert that any of the four exceptions to the application of Leon apply.  There is no evidence supporting the notion that the state court judge completely abandoned her neutral judicial role.

The third situation described above refers to alleged infirmities "with the warrant itself rather than the affidavit behind the warrant."  United States v. Carpenter, 341 F.3d 666, 673 (8th Cir. 2003).  The third exception would apply, for example, where the search warrant "failed to particularize the place to be searched or the things to be seized."  Id.  Under these circumstances, the officers executing the warrant "cannot reasonably presume it to be valid."  Id.

(quoting Leon, 468 U.S. at 923).  Here, there do not appear to be infirmities with the warrant itself.

The fourth situation is a Franks[14] situation.  But here, no defendant has raised an argument that Agent Warkenthien lied in the affidavit or made material omissions to mislead the issuing judge.

Looking at the totality of circumstances, including *all* the information known to Agent Warkenthien but not placed in the affidavit, the court concludes the Leon good faith exception applies.  Therefore, this court recommends that defendants' arguments--that evidence should be suppressed because the search of the Young Running Crane trailer was illegal--should be denied.

## G.      Was Det. Buiter Acting Unconstitutionally in Seizing Hunter?

There is no question Hunter was seized eventually in his encounter with Det. Buiter a few blocks away from the Young Running Crane trailer.  Hunter frames the question as whether he was the subject of a Terry stop or whether he was arrested.  As discussed at length above, a Terry stop requires the government to demonstrate reasonable suspicion.  An actual arrest requires the government to demonstrate probable cause.  Danaway v. New York, 442 U.S. 200, 208 (1979).  Hunter argues the government had neither reasonable suspicion nor probable cause to seize him.

---

[14] Franks v. Delaware, 438 U.S. 154 (1978).

The government asserts the stop of Hunter was constitutional under Terry.  It also justifies the seizure of Hunter by arguing police have the right to secure the premises while other officers are in the process of obtaining a search warrant.  In this case, the government argues, police secured the premises through visual surveillance instead of entering because of the possibility Hunter was armed inside the trailer.  The government argues Det. Buiter was merely trying to stop Hunter from leaving, not to arrest him.  However, the situation changed when Cruz took off running.

### 1.     Det. Buiter's Actions Were Justified Under Terry

A person has a "right to ignore the police and go about his business" and such "refusal to cooperate, without more, does not furnish the minimal level of objective justification needed" for a Terry stop.  Nevertheless, the cases distinguish between a person who is fleeing from the police and one who merely ignores the police.  See United States v. Gilliam, 520 F.3d 844, 847 (8th Cir. 2008) (citing Illinois v. Wardlow, 528 U.S. 119, 125 (2000)).  A person's unprovoked flight from police can raise a suspicion of criminal activity. Wardlow, 528 U.S. at 125.

In United States v. Jones, 606 F.3d 964 (8th Cir. 2010), the district court suppressed evidence seized at a Terry stop and the Eighth Circuit affirmed where the only evidence was that the person clutched something in the front pocket of his long-sleeved hoodie.  Jones, 606 F.3d at 965-66,  It was a medium-temperature day, starting out at 50 degrees and rising to 68 degrees, the person did not flee or act afraid of the officers, it was a high-crime area,

and there was no articulated basis for a reasonable belief that a crime was occurring. Id. The court said that clutching something in your front pocket describes too great an arc of lawful behavior to, by itself, constitute reasonable suspicion. Id.

In the Gilliam case, officers knocked on the door of a residence in order to execute an arrest warrant on someone named "Simpson." Gilliam, 520 F.3d at 845-46. Gilliam answered the door. Id. at 846. Simpson subsequently appeared at the door and Gilliam identified him as the subject of the warrant, but Simpson denied his identity and told the officers that Gilliam was the one they wanted. Id. During this interval when the officers had not yet ascertained which man was the one named in the warrant, Gilliam attempted to retreat from the police, and disobeyed their orders to stay with them. Id. The Eighth Circuit held that these circumstances justified a Terry stop of Gilliam. Id. at 847.

In the Wardlow case, Wardlow fled upon seeing police patrolling in an area known for heavy narcotics trafficking. Wardlow, 528 U.S. at 121. Two police officers chased Wardlow down and stopped him, conducting a Terry stop. Id. The Supreme Court held that this Terry stop was valid under the Fourth Amendment. Id. The Court noted that it was not merely Wardlow's presence in a high-crime area that gave rise to the necessary reasonable suspicion, but also Wardlow's unprovoked flight after he noticed the presence of the police. Id. at 124-25. As the Court stated: "Headlong flight--wherever it occurs--is the consummate act of evasion: It is not necessarily indicative of

wrongdoing, but it is certainly suggestive of such." Id. at 124.  Furthermore,

although citizens have a right to ignore police and go about their business,

unprovoked flight from police is not " 'going about one's business'; in fact, it is

just the opposite." Id. at 125.

Here, clearly, if Hunter had been the one to flee, the above cases would

justify Det. Buiter's seizure of him.  However, even though it was Cruz who

fled, not Hunter, the court believes there was justification for a Terry stop and

seizure of Hunter.

These were the facts known to Det. Buiter immediately before he parked

his unmarked vehicle and got out to encounter Hunter and Cruz:  the CI had

said that Justin and Chase had brought significant amounts of drugs with

them to Sioux Falls, that the drugs were being stored at the Young Running

Crane trailer, that Hunter was armed and guarding the drugs at the trailer,

that Hunter and Cruz[15] had been involved in a short-term stop at the Young

Running Crane trailer with occupants in the Uplander van, and that Agent

Warkenthien was in the process of applying for a search warrant for the Young

Running Crane trailer and any occupants.

When Det. Buiter got out of his vehicle, he suspected one of the men in

front of him was Hunter, but he had no photo of Hunter, only a physical

description, so he did not know for sure if either of the men was Hunter.  Then,

before Det. Buiter could even announce who he was, Cruz took off running,

_____

[15] Det. Buiter did not know the names of these men, but he recognized the two
men on foot before him as the same two men who had come out of the trailer
and met with the occupants of the Uplander van.  The court denominates them
by their given names only for ease of reference.

presumably after reading Det. Buiter's prominent description on his vest: "POLICE."  Although it was Cruz, not Hunter, who ran, this gave rise to the suggestion of wrongdoing.  Wardlow, 528 U.S. at 124.  And it was not just coincidence that Hunter and Cruz were together—they were not just both passing by independently on a sidewalk.  They had been in the Young Running Crane trailer together, they met with the occupants of the Uplander van together, and they exited the trailer and began to walk away on foot together.  Det. Buiter certainly was justified in forming a reasonable suspicion that criminal activity was afoot to stop Hunter, seize him, and pat him down for weapons.

In Terry v. Ohio, 392 U.S. 1 (1968), the Supreme Court stated the basis for a Terry stop:

> [W]here a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him."

Terry, 392 U.S. at 30.

This describes with some accuracy the situation Det. Buiter found himself in.  He had a reasonable suspicion to approach Hunter, having a reasonable belief that one of the two men was Hunter and that, therefore, one of the two men may be armed.  When he identified himself as a policeman and

nothing in that initial encounter served to dispel his reasonable fear—in fact, because Cruz took off running, his original fear was heightened--Det. Buiter was then justified in seizing Hunter, securing him and conducting a pat search.  See United States v. Jones, 535 F.3d 886, 891 (8th Cir. 2008) (the fact that the suspect took evasive action after seeing police officer behind him could be considered in determining if the officer had probable cause or reasonable suspicion); United States v. Martinez, 462 F.3d 903, 906-07 (8th Cir. 2006) (officer was justified in detaining, handcuffing, and pat searching suspect under Terry where officer had a reasonable suspicion he might be armed).

Having lawfully come into close contact with Hunter's person, Det. Buiter then smelled a strong odor of marijuana.  This gave rise to probable cause to arrest Hunter.  United States v. Perdoma, 621 F.3d 745, 749 (8th Cir. 2010).

The court concludes that Det. Buiter's encounter with Hunter did not violate the Fourth Amendment.  Accordingly, the court respectfully recommends this ground for suppression be denied as well.

### 2. Det. Buiter's Actions Were Not Valid as a Necessary Part of Securing the Premises

As an alternative basis, the government posits that Det. Buiter was justified in detaining Hunter as a necessary part of securing the premises to be searched—here, the Young Running Crane trailer.  The government relies on Michigan v. Summers, 452 U.S. 692 (1981).

In Summers, the Court held that when officers arrive on scene to execute a search warrant, they may detain any persons present on the premises during the search without having probable cause or reasonable suspicion as to those

persons.  <u>Summers</u>, 452 U.S. at 705.  Three justifications were articulated in support of the new rule:  (1) officer safety, (2) facilitating the completion of the search, and (3) preventing flight.  <u>Id.</u> at 702-03.  Subsequent cases applied the rule when persons were found in a garage adjoining the house to be searched and in a bedroom of the place to be searched.  <u>Los Angeles County v. Rettele</u>, 550 U.S. 609, 611 (2007) (bedroom); <u>Muehler v. Mena</u>, 544 U.S. 93, 96 (2005) (garage).  But because the rule of <u>Summers</u> is in derogation of the Fourth Amendment—allowing a seizure of a person with no basis for suspecting criminal activity—the rule is tightly constricted to those situations where the three articulated justifications for the rule are served.  <u>Bailey v. United States</u>, 568 U.S. 186, 194, 199 (2013).

In <u>Bailey</u>, the Court refused to extend the rule in <u>Summers</u> to the following fact pattern.  Police obtained a search warrant to search a home for a gun.  <u>Id.</u> at 190.  Prior to the search being executed, two officers were stationed outside the house surveilling it.  <u>Id.</u>  Two lay persons (one of whom was Bailey) who both loosely matched the description of the suspect left the house, entered a parked car in the driveway, and began to drive away, apparently unaware of the surveilling officers or the impending search warrant.  <u>Id.</u>  The surveillance officers watched the car leave the driveway and began following it, informing other members of their search team of their actions.  <u>Id.</u>  They followed the suspects for about a mile over the course of five minutes before pulling the vehicle over.  <u>Id.</u>  They ordered the suspects out of the car, patted them down, handcuffed them and drove them back to the home being searched.  <u>Id.</u>  The

district court denied Bailey's subsequent motion to suppress, holding the officers' detention of him was justified under Summers. Id. at 191.

The Supreme Court reversed because the three interests identified in Summers were not served by the detention in this case. Id. at 194-202. The first interest, officer safety, was actually better served by allowing the suspects to depart, thereby removing them from the scene of the search where they could pose a potential danger to the officers conducting the search. Id. at 194-95. In order to prevent the suspects from returning during the midst of the search, the Court pointed out that police could post someone as a lookout and could erect barricades. Id. at 195-96. Furthermore, if officers suspect the departing person is dangerous or involved in criminal activity, they need not rely on Summers to detain him; Terry already provides officers with the necessary authority to detain such a person. Id. at 196-97.

The second Summers rationale was to allow officers to complete the search in orderly fashion without persons hiding or destroying evidence or otherwise obstructing the search. Id. at 197. Again, this interest is not implicated when the person is not in the immediate environs of the place to be searched. Id. at 197-98. This interest is actually furthered by allowing departing persons for whom there is no reasonable suspicion or probable cause to leave and get out of the officers' way. Id.

The third Summers rationale was preventing flight. Id. at 198. The Court clarified that this interest is concerned *not* with flight in and of itself, but rather with the damage that potential flight might cause to the integrity of the

search.  Id. at 199.  If unbounded by geographic restrictions, the need to prevent flight might be used by police to justify detaining any number of persons in the general neighborhood or 10 miles away.  Id.  The Summers rule could not be extended this far without undermining Fourth Amendment principles the Court held.  Id.  Rather, the government would need to show that preventing a person from fleeing somehow impacted the integrity of the search itself.  Id.

The Bailey Court offered a final observation cogent to the limitation of the rule in Summers.  Where persons are present inside a home and are detained during a search, the impact on their personal liberty is limited.  Id. at 199-200. They are already inside the confines of the home, shielded from public view and are therefore not exposed to public view and the concomitant stigma and indignity accompanying public detention by police.  Id.  Where, however, as in the facts of the Bailey case, persons are apprehended far from the search premises, the intrusion on their liberty interests is heightened.  Id. at 200.  The apprehension and detention take place in public view; the persons are often handcuffed and loaded into a police car to be taken back to the scene of the search.  Id.  To outsiders, such actions are indistinguishable from an arrest. Id.  Therefore, the person detained suffers shame and public condemnation in a way that a person detained inside a house does not.  Id.

This court believes that Summers cannot shield Det. Buiter's detention of Hunter under the facts of this case.  Det. Buiter testified he and Det. Christiansen watched Hunter and Cruz exit the trailer home.  They could have

intercepted the two right then.  Instead, they chose to follow the two men in their unmarked cars until they reached a place one to two blocks away from the Young Running Crane trailer.  At this distance, the detention of Hunter and Cruz no longer served any of the three <u>Summers</u> rationales.

As in <u>Bailey</u>, the fact that the men were exiting the trailer actually facilitated, rather than obstructed, the impending search as they would not be present to hide or destroy evidence, to interfere with the search, or to pose a danger to the officers conducting the search.  As in <u>Bailey</u>, any potential that Hunter and Cruz may return to the trailer during the midst of the search could be addressed by posting a police officer as a lookout at the trailer and/or by erecting barricades.

Finally, the government articulates no basis for this court to conclude that the flight of one or both men would impact the integrity of the search.  Thus, <u>Summers</u> does not justify detaining Hunter.  However, <u>Terry</u> does provides the necessary authority justifying Det. Buiter's actions.  Accordingly, the court recommends denying Hunter's motion to suppress based on his argument that his detention by Det. Buiter was in violation of the Fourth Amendment.

**H.  Federal Search Warrants**

The defendants do not expressly make an argument that the fruits of the searches of their cell phones pursuant to the federal search warrants should be suppressed.  They do argue that everything discovered after the traffic stop is

fruit of the poisonous tree and should be suppressed. This would logically include the federal search warrants.

To the extent defendants are arguing for such suppression, this court recommends denying those requests for the same reasons discussed above. Namely, that (1) the traffic stop and subsequent search of the van was legal, (2) the search pursuant to the federal warrants was sufficiently attenuated from the traffic stop to purge the taint of any Fourth Amendment violation that may have occurred, and (3) the search pursuant to the federal warrant falls within the <u>Leon</u> good faith exception to the exclusionary rule.

## CONCLUSION

Based on the foregoing law, facts, and analysis, this magistrate judge respectfully recommends:

1. Defendant Justin Morales' motion to suppress [Docket Nos. 76 & 91] should be denied in part and granted in part:

    a. The motion to suppress physical evidence obtained from the traffic stop and the search of the Young Running Crane trailer should be denied in its entirety.

    b. The motion to suppress his statements made to law enforcement should be granted as to the statements made from 15:10:50 until 15:33:30 on Exhibit B.

    c. The motion to suppress statements Justin made to law enforcement should be denied as to the statements made from 15:33:36 until the end of Exhibit B.

2. Defendant Chase Guzman's motion to suppress [Docket No. 73] should be denied in its entirety.

3. Defendant Daniel Hunter Guzman's motion to suppress [Docket No. 84] should be denied in its entirety.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED August 31, 2017.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge