# UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JUSTIN THOMAS MORALES,<br>a/k/a "Speedy,"<br>CHASE LOGAN GUZMAN, and<br>DANIEL HUNTER GUZMAN,<br><br>Defendants. | 4:16-CR-40124-KES<br><br><br>ORDER ADOPTING REPORT<br>AND RECOMMENDATION AS<br>MODIFIED AND DENYING MOTIONS<br>TO SUPPRESS |

Defendants Justin Thomas Morales, Chase Logan Guzman, and Daniel Hunter Guzman are charged with conspiracy to distribute a controlled substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. Docket 49. Defendant Chase Guzman is also charged with carrying a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A). *Id.* All three defendants have filed motions to suppress evidence obtained and statements made. Dockets 73, 76, 84, 91. The court referred defendants' motions to Magistrate Judge Veronica Duffy under 28 U.S.C. § 636(b)(1)(B). After holding an evidentiary hearing, Magistrate Judge Duffy recommended the following:

1. Defendant Justin Morales's motion to suppress (Docket 76, 91) should be denied in part and granted in part:

a. The motion to suppress physical evidence obtained from the traffic stop and the search of the Young Running Crane trailer should be denied.

b. The motion to suppress his statements made to law enforcement should be granted as to the statements made from 15:10:50 until 15:33:30 on Exhibit B.

c. The motion to suppress his statements made to law enforcement should be denied as to the statements made from 15:33:36 until the end of Exhibit B.

2. Defendant Chase Guzman's motion to suppress (Docket 73) should be denied.

3. Defendant Daniel Hunter Guzman's motion to suppress (Docket 84) should be denied.

All three defendants object to various findings in the Report and Recommendation. Dockets 116, 117, 118. After a de novo review of the Report and Recommendation and a review of the record, the court adopts the Report and Recommendation as modified below and denies the defendants' motions.

## LEGAL STANDARD

This court's review of a magistrate judge's report and recommendation is governed by 28 U.S.C. § 636 and Rule 72 of the Federal Rules of Civil Procedure. The court reviews de novo any objections to the magistrate judge's recommendations with respect to dispositive matters that are timely made and specific. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Because motions to

suppress evidence are considered dispositive matters, a magistrate judge's recommendation regarding such a motion is subject to de novo review. 28 U.S.C. § 636(b)(1)(A); *see also United States v. Raddatz*, 447 U.S. 667, 673 (1980). In conducting a de novo review, this court may then "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1); *see also United States v. Craft*, 30 F.3d 1044, 1045 (8th Cir. 1994).

**FACTS**

Justin has objected to some of the magistrate judge's factual findings. *See* Docket 117. A full recitation of the facts can be found in the Report and Recommendation (Docket 111), but after a de novo review of the evidence, the court finds the pertinent facts relevant to defendants' objections are as follows:

On or about March 10, 2016, ATF Special Agents Emmet Warkenthien and Brent Fair[1] were contacted by a confidential informant (CI) with information that a "Speedy," later identified as Justin Morales from Wichita, Kansas, was trafficking large quantities of methamphetamine to Sioux Falls and other nearby areas for sale. Docket 99 at 15:4-23; 19:21-20:23. This particular CI had previously worked with ATF and provided reliable information. Docket 87-1 at 3. Speedy wanted the CI to help transport the drugs from Wichita and distribute the drugs in the Sioux Falls area. Docket 99 at 21:4-12. The CI also conveyed to the officers that Speedy indicated he had

---

[1] SA Warkenthien was the lead agent in this investigation, but was unable to testify at the hearing. Docket 99 at 14:6-15. SA Fair was SA Warkenthien's partner and has been familiar with this investigation from the beginning. *Id.* at 14:16-15:12.

firearms for sale as well, and SA Fair corroborated this statement by seeing screen-capture photos of Justin holding firearms. *Id.* at 21:15-22:18. Upon conducting a criminal history check on Justin, the officers learned Justin had at least one prior felony conviction and thus was prohibited from possessing firearms. *Id.* at 22:25-23:6; 107:6-12.

On April 20, 2016, the CI received a sample of methamphetamine from Justin at a Sioux Falls gas station. *Id.* at 23:7-24:8. Later that same day, the ATF agents conducted surveillance on Justin and observed him provide five ounces of methamphetamine to the CI in exchange for $5,000 in a controlled purchase at a Sioux Falls restaurant parking lot. *Id.* at 24:4-25:23. Over the next several months, the CI discussed purchasing methamphetamine from Justin in many recorded telephone conversations with Justin. *Id.* at 40:4-21.

SA Fair testified that on September 22, 2016, the CI contacted SA Warkenthien and told Agent Warkenthien that Justin Morales and Chase Guzman were staying at the Days Inn hotel in Sioux Falls and they had methamphetamine and marijuana to sell. *Id.* at 30:3-8; 31:1-10. Based on the CI's report, SA Fair began conducting surveillance on the Days Inn hotel. *Id.* at 41:19-42:6. He observed two vehicles with Kansas license plates parked there, which were registered to Jacqueline Morales and Chase Guzman. *Id.* One of the two Kansas-plated vehicles, a grey minivan, left but eventually returned to the Days Inn hotel parking lot where SA Fair saw Justin Morales and another male exit the minivan and get into the CI's vehicle. *Id.* at 44:2-17. Prior to the traffic stop later in the day, this other male was identified as Chase Guzman by other

law enforcement officers who were also working on the investigation. *Id.* at 209:2-210:4. SA Fair testified that the CI, Justin, and Chase then went to lunch together. *Id.* at 44:2-17.

The CI's vehicle returned to the hotel parking lot and dropped off Justin and Chase. *Id.* at 46:7-12. SA Fair was in contact with the CI, who indicated methamphetamine had been placed in a pizza box. *Id.* at 46:15-21. SA Fair and other law enforcement officers surveilling the area then observed Justin and Chase access the Kansas-plated pickup truck and get into the Kansas-plated minivan with a pizza box. *Id.* at 46:22-47:4.

The ATF agents on surveillance followed Justin and Chase as they drove the grey minivan to the trailer home of Jerri Lynn Running Crane and later to a Hardee's restaurant parking lot area. *Id.* at 50:24-51:13; 56:1-24. Meanwhile, around the time the grey van stopped at the trailer home, SA Warkenthien began writing the affidavit for a search warrant for the trailer home of Jerri Lynn Running Crane, and he included information provided to him by the surveillance team over the radio as they gathered it. *Id.* at 146:1-14.

SA Fair testified that because the grey minivan subsequently drove on the back side of a Lowe's parking lot where people do not normally drive, he believed their surveillance would be detected before they could conduct a traffic stop. *Id.* at 57:1-16. And Detective Dan Christiansen, who observed the grey van drive in a circle around the Lowe's building, testified that he was "sure [he] was noticed following this vehicle" and believed their surveillance was compromised. *Id.* at 190:13-193:1. Thus, the officers' perception was that they

needed to conduct the traffic stop of the minivan soon before the minivan could lose them or cause any public harm. *See id.* at 53:4-54:25. SA Fair testified that law enforcement wanted a marked police car to stop Justin and Chase's van. *Id.* at 53:4-54:25. Because they knew Justin and Chase were armed, a marked police car would be better for pursuit purposes if Justin and Chase attempted to flee, and drivers would be more suspicious if they were stopped by an unmarked vehicle. *Id.*

Detective Christiansen contacted Trooper Andrew Steen, who was not part of the investigation team, and directed him to conduct a routine traffic stop of the grey minivan. *Id.* at 154:7-155:6. Trooper Steen, in his marked patrol car, located the grey van and began following it. *Id.* at 155:11-15. Trooper Steen testified that he did not personally observe any traffic violations while following the grey van. *Id.* at 157:1-2. But he stopped the van, walked up to the driver's side, and told the driver—Justin Morales—that Justin's van had a broken taillight. *Id.* at 157:3-14. Both SA Fair and Trooper Steen testified that this "ruse" traffic stop was conducted because it was too time-sensitive to wait for a traffic violation to arise and there was a safety concern, as law enforcement knew Justin and Chase had firearms in the van. *Id.* at 94:8-25; 157:6-14.

Trooper Steen then asked Justin to come back to his patrol car, where he asked Justin several questions and they watched another officer, Jason Christensen, approach the grey van on the passenger side and begin speaking with Chase. *Id.* at 157:17-159:16. Officer Christensen, a police officer for the

City of Sioux Falls who was asked to assist on this traffic stop, approached Chase and asked him to step out of the vehicle. *Id.* at 183:11-20. When Chase opened the car door to step out, Officer Christensen observed marijuana between the door and passenger seat. *Id.* at 184:1-12. Officer Christensen placed Chase in handcuffs and searched him, finding a glass marijuana pipe on his person. *Id.* at 184:8-20. Trooper Steen and Officer Christensen then searched the van and found about one pound of marijuana in a bag, a digital scale that tested positive for methamphetamine, cell phones, and some cash. *Id.* at 160:5-25. Both Justin and Chase were then taken into custody and transported to the police station by Trooper Steen and Officer Christensen, respectively. *Id.* at 161:23-162:6; 186:2-13. At the station, officers found methamphetamine and a loaded handgun on Chase's person. *Id.* at 64:2-67:24.

Meanwhile, SA Warkenthien was writing the affidavit for the search warrant while the traffic stop of the grey van occurred. *Id.* at 146:3-14. Included in the warrant affidavit was information gathered from the traffic stop as it was conveyed to SA Warkenthien over the radio. *Id.*

Later that afternoon and early evening, Narcotics Detective Adam Buiter and Detective Christiansen continued to conduct surveillance on the Young Running Crane trailer home. *Id.* at 211:2-25. Although Detective Buiter was not able to positively identify one of two men seen leaving the trailer home as Daniel Hunter Guzman, he knew law enforcement was still looking for Daniel as part of this investigation. *Id.* at 212:10-17. When they observed two males leave the trailer home on foot, Detectives Buiter and Christiansen followed

them and parked their unmarked police vehicles next to the curb in front of and behind the two men. *Id.* at 213:1-17. Detective Buiter, wearing his police vest and with his badge exposed, stepped out of his car, and one of the two males—later identified as Cruz Young Running Crane—immediately ran away. *Id.* Detective Buiter ordered the remaining man—Daniel Hunter Guzman—to the ground, detained and handcuffed him, and conducted a pat down for weapons. *Id.* at 214:4-215:3. Detective Buiter smelled a strong marijuana odor coming from Daniel's person and believed him to be armed based on information received from SA Warkenthien earlier in the day. *Id.* at 215:4-13. As a result of the pat down and search, Detective Buiter found methamphetamine, a cell phone, and a business card for a Kansas parole officer. *Id.* at 215:14-217:10. Daniel was then transported to the jail. *Id.* at 216:2-8. Cruz was never apprehended. *Id.* at 70:11-17.

Upon receiving a search warrant based on the affidavit submitted by SA Warkenthien, law enforcement officers conducted a search of the Kansas-plated truck parked at the Days Inn hotel, Jerri Lynn Running Crane's trailer home, and all persons present at the trailer home. *See* Docket 87-1; Docket 99 at 73:9-74:3. At the trailer home, the officers found two pounds of marijuana, two pounds of methamphetamine, and drug paraphernalia. Docket 99 at 73:17-74:20. Officers also found ammunition in the pickup truck at the Days Inn. *Id.* at 74:21-75:10. Finally, officers searched the cell phone found on Chase's person as authorized by a search warrant, where they found text messages related to drug distribution. *Id.* at 75:11-76:9.

**DISCUSSION**

Defendants raise numerous objections to Magistrate Judge Duffy's
Report and Recommendation relating to their rights under both the Fourth and
Fifth Amendments. The court will address each legal objection in turn.

## I.     The Stop of the Van was Justified.

After evaluating the totality of the circumstances known to law
enforcement prior to initiating the traffic stop, Magistrate Judge Duffy
concluded the traffic stop was supported by reasonable suspicion and thus did
not violate the Fourth Amendment. Docket 111 at 30. Defendant Chase
Guzman first objects to Magistrate Judge Duffy's finding that police "knew the
identities of the two occupants of the grey van long before the traffic stop was
conducted." Docket 118 at 2; *see also* Docket 111 at 29. Defendants Justin,
Chase, and Daniel all object to Magistrate Judge Duffy's conclusion that the
resulting traffic stop of the grey van was justified, arguing that the evidence
presented at the suppression hearing does not amount to reasonable
suspicion. Dockets 116 at 2; 117 at 5; 118 at 2.

The Eighth Circuit Court of Appeals has summarized the well-established
law regarding traffic stops:

> The Fourth Amendment prohibits unreasonable searches and
> seizures. A traffic stop constitutes a seizure of a vehicle's
> occupants, including any passengers. A traffic stop must be
> supported by reasonable suspicion or probable cause. A law
> enforcement officer has reasonable suspicion when the officer is
> aware of particularized, objective facts which, taken together with
> rational inferences from those facts, reasonably warrant suspicion
> that a crime is being committed. Any traffic violation, however
> minor, provides probable cause for a traffic stop. The
> determination of whether probable cause, or reasonable suspicion,

existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time. Even an officer's incomplete initial observations may give reasonable suspicion for a traffic stop. Mistakes of law or fact, if objectively reasonable, may still justify a valid stop.

*United States v. Hollins*, 685 F.3d 703, 705-06 (8th Cir. 2012) (internal quotations and citations omitted). A traffic stop based on probable cause gives officers "considerably more leeway" than a traffic stop based on reasonable suspicion, which must be "justified at its inception and reasonably related in scope to the circumstances which justified the interference in the first place." *Rodriguez v. United States*, 135 S. Ct. 1609, 1621 (2015) (citation omitted). Thus, the court must determine whether the traffic stop in this case was supported by probable cause or reasonable suspicion.

While even a minor traffic violation gives an officer probable cause to conduct a traffic stop, Trooper Steen testified that he was instructed to conduct a "ruse" traffic stop, and he told Justin that he had a broken tail light even though that was not true. Docket 99 at 157:1-14. Because law enforcement thought their surveillance was detected and had reason to believe Justin and Chase were armed, they needed to stop the van as soon as possible instead of waiting for the van to commit a traffic violation. *Id.* at 94:8-25; 157:6-14. Thus, Trooper Steen did not have probable cause to stop the van arising from a traffic violation.

Law enforcement did, however, have reasonable suspicion to stop the van. The Supreme Court has "firmly rejected the argument 'that reasonable cause for an investigative stop can only be based on the officer's personal

observation . . . .' " *Navarette v. California*, 134 S. Ct. 1683, 1688 (2014)

(quoting *Adams v. Williams*, 407 U.S. 143, 147 (1972)). Thus, an officer can

lawfully initiate a traffic stop based on reasonable suspicion that the officer

receives from a third party. Here, Trooper Steen, while not a member of the

investigative team leading up to the stop of the van, was instructed by other

law enforcement officials to pull over this particular van because the occupants

were in possession of methamphetamine and firearms. Docket 99 at 153:4-13.

Thus, if the officers providing this information to Trooper Steen had reasonable

suspicion of criminal activity, Trooper Steen's traffic stop of the van was

justified.

 Under the Fourth Amendment, a traffic stop based on reasonable

suspicion is permitted when law enforcement has " 'a particularized and

objective basis for suspecting the particular person stopped of criminal

activity.' " *Navarette*, 134 S. Ct. at 1687 (quoting *United States v. Cortez*, 449

U.S. 411, 417-18 (1981)). "While reasonable suspicion must be more than an

inchoate hunch, the Fourth Amendment only requires that police articulate

some minimal, objective justification . . . ." *United States v. Tamayo-Baez*, 820

F.3d 308, 312 (8th Cir. 2016) (quotation omitted).

 It is well established that both the driver and any passengers in a vehicle

have standing to challenge a seizure such as a traffic stop. *Brendlin v.

California*, 551 U.S. 249, 257 (2007). But "Fourth Amendment rights are

personal rights that may not be asserted vicariously." *United States v.

Barragan*, 379 F.3d 524, 529 (8th Cir. 2004). Thus, Justin and Chase, as

driver and passenger in the van, may challenge whether there was reasonable suspicion to stop the van in this case. Daniel, however, was not a passenger in the vehicle or even involved in the traffic stop. With no personal expectation of privacy in the seizure or search of the van, Daniel does not have standing to object to Magistrate Judge Duffy's conclusion that the traffic stop was justified.

Both Justin and Chase argue that law enforcement did not know Justin and Chase were the occupants of the van leading up to the stop. Docket 117 at 5-7; Docket 118 at 3-4. Justin argues that the officers did not have enough verified information to support reasonable suspicion. Specifically, it is Justin's position that the officers acted prematurely in stopping the van and the CI did not provide reliable information to officers in this case. Docket 117 at 5-7.

The court disagrees with these arguments. There are numerous facts in the record supporting the conclusion that law enforcement "knew the identities of the two occupants of the grey van long before the traffic stop was conducted." Docket 111 at 29. ATF Special Agents monitored the CI's interactions and recorded communications with Justin Morales for six months prior to the September 22, 2016 stop. On April 20, 2016, Justin provided the CI with a sample of methamphetamine at a Sioux Falls gas station and later provided the CI with five ounces of methamphetamine in a controlled buy in Sioux Falls. Docket 99 at 23:7-25:23. SA Fair testified that he personally observed that controlled buy. *Id.* at 104:12-16. SA Fair also testified that while conducting surveillance of the Days Inn hotel on September 22, 2016—where the CI told law enforcement Justin and Chase were staying—he observed two

12

Kansas-plated vehicles in the parking lot. *Id.* at 41:16-42:6. One vehicle was registered to Chase Guzman, and the other was registered to Jacqueline Morales. *Id.* While Chase disputes Agent Fair's testimony on this fact because no law enforcement report documents that a license plate check was run on September 22, 2016 (Docket 118 at 2), the court finds SA Fair's testimony that the investigative team ran the plates of the Kansas vehicles before initiating the traffic stop credible. SA Fair then personally identified Justin Morales in the Days Inn parking lot on September 22, while other law enforcement officials identified Chase Guzman. *Id.* at 44:2-17. When Justin and Chase returned to the Days Inn from lunch, SA Fair and other officers on surveillance observed both Justin and Chase enter the Kansas-plated grey van and the officers followed them as they drove away. *Id.* at 46:7-47:4.

Chase points out that SA Fair was not able to say which officer identified Chase while in the Days Inn parking lot. Docket 118 at 2-3. But there are additional objective facts which, taken together with reasonable inferences from those facts, support law enforcement's identification of Chase prior to the traffic stop. Specifically, the CI told SA Warkenthien that Justin and Chase were in Sioux Falls on September 22, 2016, and staying at the Days Inn hotel. The license plate check of the two Kansas-plated vehicles parked at the Days Inn on September 22 confirmed one of the vehicles was owned by Chase Guzman. Finally, Detective Buiter testified that he identified Chase, based on a photo, when Chase, Justin, and a third male exited the trailer home and accessed the grey van. Docket 99 at 209:8-25. ATF agents surveilled the grey

van from the moment Justin and Chase left the Days Inn, during their stop at the trailer home, during their stop at Hardee's, up until Trooper Steen initiated the traffic stop. There is no evidence in the record indicating that the ATF agents on surveillance on September 22, 2016, ever lost sight of the grey van. Thus, the record supports the conclusion that the officers knew the occupants of the grey van were Justin and Chase before Trooper Steen initiated the traffic stop.

Justin further argues that law enforcement failed to corroborate enough of the CI's tips to validly stop the van and points to information the CI provided to law enforcement that did not end up happening. *See* Docket 117 at 7. First, Justin takes issue with the fact that SA Fair testified that he was receiving information from the CI that "meth was placed in what [the CI] described as a Little Caesar's pizza box," but then agents saw Justin and Chase with a "white" pizza box. That the CI described the pizza box as one from Little Caesar's is not an issue here. Rather, the CI provided law enforcement with specific and detailed information that the defendants placed meth in a pizza box, and it is common knowledge that pizza boxes have distinct shapes. Because the officers then observed Justin and Chase with a pizza box, the court finds this information from the CI to be a corroborated, objective fact.

Second, Justin argues that the CI's information was not reliable, and thus law enforcement acted prematurely, because SA Fair received word from the CI that the van was going to drive to Lake Andes but it did not. SA Fair testified that he expected the van to make a trip to Lake Andes at some point—

not necessarily immediately upon leaving the Days Inn hotel. The fact that the van drove to the trailer home of Jerri Lynn Running Crane instead could have been a quick stop before their eventual trip to Lake Andes, so this occurrence does not render the CI's information unreliable.

Based on the foregoing facts known to the officers prior to directing Trooper Steen to stop the grey van, the officers had more than a "mere hunch" that criminal activity was afoot. *See Navarette*, 134 S. Ct. at 1687. With corroborated evidence from the CI that Justin and Chase intended to distribute drugs and possibly firearms in the Sioux Falls area, ATF's previous observation of a controlled-buy of methamphetamine between the CI and Justin, and positive identification that the occupants of the grey van were in fact Justin and Chase, the ATF agents had reasonable suspicion that the occupants of the grey van were engaged in criminal activity. Because the law enforcement officials supplying Trooper Steen with this information had reasonable suspicion that the occupants of the van were engaged in criminal activity, Trooper Steen's stop of the van was justified based on the totality of the circumstances.

## II. The Search of the Van was Legal.

Justin's next objection is that because the stop of the van violated the Fourth Amendment, the search of the van was also illegal. Docket 117 at 8. Because this court has concluded that the traffic stop of the van was supported by reasonable suspicion, and thus did not violate the Fourth Amendment, the resulting search was proper. While the officers did not have a search warrant

15

for the van, they did not need one. Officer Christensen, a police officer asked to assist Trooper Steen on the traffic stop, approached the passenger side of the van and asked Chase to step out of the vehicle. Docket 99 at 183:11-20. Law enforcement officials had information that Justin or Chase was armed with weapons in the car, and the law allows officers to ask vehicle occupants to exit the vehicle for safety purposes. *See Maryland v. Wilson*, 519 U.S. 408, 413-14 (1997) (holding that officers may order passengers out of the vehicle during a traffic stop because traffic stops "may be dangerous encounters" for police officers). When Chase opened the passenger door to exit the van, Officer Christensen immediately saw marijuana in a clear plastic baggie between the passenger seat and door. *See United States v. Bynum*, 508 F.3d 1134, 1137 (8th Cir. 2007) (stating that the plain view doctrine allows officers to seize evidence without a warrant if "the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object."). Thus, Officer Christensen's seizure of the marijuana was proper and gave the officers probable cause to search the entire van. The seizure of the illegal items during the search did not violate the Fourth Amendment rights of Justin or Chase.

## III.   All but One of Justin's Statements to Trooper Steen are Admissible.

In the report and recommendation, Magistrate Judge Duffy thoroughly analyzed the law regarding whether a person is subject to custodial interrogation prior to receiving Miranda rights and thus whether the person's statements should be suppressed. *See* Docket 99 at 37-44. The court refers to

Magistrate Judge Duffy's summary of the law and will only expand on the law relevant to any objections raised.

Magistrate Judge Duffy concluded Justin was in custody—or otherwise not free to leave—when Officer Christensen found the baggie of marijuana in the van, and thus Justin's statements in response to Trooper Steen's interrogation from 15:10:50 through 15:33:30 violated Justin's *Miranda* rights. Docket 111 at 45-46. There has been no objection to Magistrate Judge Duffy's recommendation that all of Justin's statements from 15:10:50 through 15:33:30 be suppressed (Docket 111 at 46), so the court adopts that portion of the report and recommendation. The court will address Justin's objection to Magistrate Judge Duffy's recommendation that his statements made after 15:33:30 are admissible. *See* Docket 117 at 8. The question is whether Justin's statements from 15:33:30 through the end of Exhibit B, while Justin was still in custody, were made in violation of *Miranda*.

Miranda warnings must be given to a suspect subject to custodial interrogation. *See United States v. Flores-Sandoval*, 474 F.3d 1142, 1146 (8th Cir. 2007). Interrogation in this context refers to "express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "Under the Fifth Amendment, even if a *Miranda* violation is found, that does not render all later statements automatically inadmissible." *United States v. Hernandez*, No.

8:12CR332, 2013 WL 3071262, at *10 (D. Neb. June 18, 2013) (citing *Oregon v. Elstad*, 470 U.S. 298, 318 (1985)).

In *Oregon v. Elstad*, the United States Supreme Court rejected the application of the fruit of the poisonous tree doctrine to non-coercive *Miranda* violations. *Elstad*, 470 U.S. at 304. The suspect in *Elstad* made an incriminating statement before receiving his *Miranda* rights, but then he subsequently waived his *Miranda* rights and confessed. *Id.* at 301-02. The Supreme Court concluded that a suspect's initial statement in violation of *Miranda* does not taint a subsequent voluntary statement. *Id.* at 309.

While *Elstad* involved an initial incriminating statement and a voluntary statement following the suspect's receipt of *Miranda* rights, courts have applied this principle to situations involving two separate incriminating statements, neither of which were preceded by *Miranda* warnings. In *United States v. Abdulla*, 294 F.3d 830 (7th Cir. 2002), the Seventh Circuit Court of Appeals affirmed a district court's denial of the defendant's motion to suppress confessions. Abdulla, indicted for aggravated bank robbery, was apprehended by FBI Agents at an airport. *Id.* at 832. The FBI agents handcuffed Abdulla, told him he was under arrest, and asked him if he knew why he was being arrested, all prior to advising Abdulla of his *Miranda* rights. *Id.* Abdulla replied, "I robbed a bank, everyone knows I robbed a bank." *Id.* The agents stayed with Abdulla for twenty minutes, and he subsequently made more incriminating statements but none of them were in response to any questions by the FBI agents. *Id.* During the drive to the FBI office, Abdulla made further statements,

but again not in response to questioning. *Id.* at 832-33. At the FBI office, Abdulla received his *Miranda* rights and made no further statements. *Id.* at 833.

The government agreed that Abdulla was under arrest, and thus in custody, when the agents handcuffed him at the airport. *Id.* at 834. The Seventh Circuit reasoned that Abdulla's subsequent statements, both while waiting in the airport and in the car on the way to the FBI office, were "volunteered statements not made in response to any question posed by the agents." *Id.* at 835. The *Abdulla* court discussed the *Elstad* principle and noted "the 'fundamental import of the Fifth Amendment privilege while an individual is in custody is not whether he is allowed to *talk* to the police without the benefit of warnings and counsel, but whether he can be *interrogated.*' " *Id.* at 835-36 (emphasis in original) (quoting *Medeiros v. Shimoda*, 889 F.2d 819, 825 (9th Cir. 1989)). Examining the surrounding circumstances and police conduct, the Seventh Circuit concluded that "Abdulla spontaneously made his subsequent statements" in over a fifty-minute period in two separate locations, making his statements voluntary and properly admitted into evidence. *Id.* at 836-37.

The facts here are similar to the facts in *Abdulla*. Once Officer Christensen found the baggie of marijuana in the van, he immediately handcuffed Chase. This happened directly in front of Justin, who was simultaneously being questioned by Trooper Steen while sitting in the front of Trooper Steen's vehicle. Thus, a reasonable person in Justin's place would

know he was about to be arrested after watching Officer Christensen find the marijuana. For this reason, the statements Justin made in response to Trooper Steen's questions while sitting in the front of Trooper Steen's vehicle will be suppressed, as recommended by Magistrate Judge Duffy.

Trooper Steen can be heard questioning Justin while both were seated in Trooper Steen's vehicle until 15:17:00, when Trooper Steen then exited his patrol car and began talking with presumably Officer Christiansen. The sounds heard in Exhibit B suggest that Trooper Steen moved Justin to the backseat of his patrol car, and we can see Trooper Steen begin to count Justin's cash in the front of his patrol car at around 15:18:00. Trooper Steen then assisted Officer Christiansen with the search of the van. At 15:29:53, Trooper Steen started driving Justin to the police station, but never administered *Miranda* warnings to Justin. At 15:33:36, Justin started to ask Trooper Steen questions about where he was going, how the van would be impounded, what he would be charged with, the jail size, and what the officers found in the van during their search. Similar to *Abdulla*, all of Justin's statements and questions were spoken spontaneously and voluntarily—not in response to questions by a police officer.

Justin argues that only a few minutes passed between Justin's initial interrogation and subsequent statements, and Trooper Steen "subtly" questioned Justin in an attempt to elicit incriminating responses. Docket 117 at 8. But Justin's spontaneous statements and questions were made 16 minutes after Trooper Steen initially questioned Justin and after Justin was

20

moved to the back of Trooper Steen's patrol car. After reviewing the evidence, the court does not find that Trooper Steen "subtly" questioned Justin. Trooper Steen answered each of Justin's questions in a simple manner but did not pose further questions to Justin except once. Specifically, at 15:40:54, after almost a minute of silence, Trooper Steen asked Justin how he could secure a hotel room without an ID on him. This question, reasonably likely to elicit some sort of incriminating response as Trooper Steen knew these out of state men came to the hotel with the intent to sell drugs in Sioux Falls, amounts to interrogation while Justin was in custody in Trooper Steen's car. Thus, Justin's response from 15:41:00 through15:41:14 will be suppressed.

All of Justin's other statements from 15:33:36 through the end of Exhibit B were voluntary and not subject to *Miranda*'s prohibition on custodial interrogation. As such, these statements are admissible.

## IV. The Searches of the Young Running Crane Trailer Home and Chase's Vehicle were Proper.

Justin argues that if the court finds his Fourth Amendment rights were violated by the stop and search of the van, then under the fruit of the poisonous tree doctrine, he has standing to object to the subsequent search of the Young Running Crane trailer home. Docket 117 at 9. Because the court has concluded that the stop and search of the van did not violate Justin's Fourth Amendment rights, the search of the trailer home was not tainted under the fruit of the poisonous tree doctrine. As Magistrate Judge Duffy explained, Justin has no further grounds to challenge the search of the Young Running Crane trailer home.

Magistrate Judge Duffy found that Daniel had a legitimate expectation of privacy in the trailer home of Jerri Young Running Crane as he was an overnight guest. Docket 111 at 54. Daniel and Chase object to Magistrate Judge Duffy's conclusion that law enforcement would have applied for their search warrant of the trailer home and Chase's vehicle even without the information gathered from the traffic stop and further object to her finding that the search warrant affidavit supports probable cause even without the evidence obtained during the traffic stop. Docket 116 at 3-4; Docket 118 at 5. This argument, however, rests on the notion that the traffic stop evidence was obtained illegally. Because the court has found the traffic stop and subsequent search of the van did not violate the Fourth Amendment rights of any defendant, the court does not need to address this objection. The evidence obtained from the traffic stop was properly included in the affidavit to search the Young Running Crane trailer home and Chase's truck.

## V.     There is No Need to Address the *Leon* Good Faith Exception.

Justin, Chase, and Daniel all object to Magistrate Judge Duffy's conclusion that the *Leon* good faith exception applies. Docket 116 at 4-5; Docket 117 at 11; Docket 118 at 6. Defendants again base their objections on the argument that the evidence from the traffic stop was obtained illegally. Because the court finds that the traffic stop was conducted legally—and the evidence from the stop was obtained legally—the court does not need to address the application of the *Leon* good faith exception or defendants' objections to its application.

**VI.    Law Enforcement had Reasonable Suspicion to Stop Daniel.**

Daniel objects to Magistrate Judge Duffy's conclusion that Detective

Buiter had reasonable suspicion to conduct a *Terry* stop of Daniel. Docket 116

at 6. Incorporating his previous memorandum (Docket 105), Daniel asserts

that Detective Buiter's initial detention of Daniel was actually an arrest and

thus required probable cause. *Id.*

Police may conduct a *Terry* stop, a seizure under the Fourth Amendment,

when they have reasonable, articulable suspicion—based on specific,

articulable facts—that a person is engaging in criminal activity. *United States v.

Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (citing *Terry v. Ohio*, 392 U.S. 1, 21

(1968)). An investigative *Terry* stop, however, is similar to an arrest "if the

officers' conduct is more intrusive than necessary for an investigative stop."

*United States v. Rose*, 731 F.2d 1337, 1342 (8th Cir. 1984). *See also United

States v. Navarrete-Barron*, 192 F.3d 786, 790 (8th Cir. 1999) (noting that a

*Terry* stop can turn into an arrest if the stop lasts an unreasonably long time

or if officers use unreasonable force). To arrest a person without a warrant,

officers must have probable cause. *See United States v. Newell*, 596 F.3d 876,

880 (8th Cir. 2010).

Detective Buiter, as part of the investigative team on September 22,

2016, was one of the officers conducting surveillance on the Days Inn hotel

when Justin and Chase were identified. During this time, Detective Buiter

learned that the CI said Justin and Chase had placed methamphetamine in a

pizza box. Docket 99 at 46:3-49:25; 207:4-208:4. Officers on surveillance then

followed the grey minivan, with Justin and Chase in it, to the trailer home of Jerri Young Running Crane. *Id.* at 208:9-25. Detective Buiter testified that he observed the van arrive at the trailer home. *Id.* He further testified that after Justin, Chase, and a third unidentified male left the trailer home, he stayed near the trailer home to continue surveillance "because there were potentially more people involved." *Id.* at 210:6-14. While he did not personally see any of the three males carry something, such as a pizza box, into or out of the trailer home, Detective Buiter testified that in his training and experience, people often conceal drugs on their person so they are not in plain view for other people in the area to see. *Id.* at 228:11-25.

During his surveillance later in the afternoon, Detective Buiter saw two males leave the trailer home, meet with someone in a Chevy Uplander, and go back into the trailer home. *Id.* at 211:1-17. While Detective Buiter followed the Chevy Uplander and thus spent a bit of time away from his surveillance of the trailer home, he later saw the same two males exit the trailer home again. *Id.* at 211:9-25. The two males cut through yards on foot, but the officers continued to follow them. *Id.* at 211:19-212:17.

All of these facts amount to reasonable suspicion, based on articulable and specific facts, that the two males who left the trailer home of Jerri Young Running Crane were possibly engaged in criminal activity. Officer Buiter knew that Justin and Chase had placed methamphetamine in a pizza box at the Days Inn hotel before arriving at the Young Running Crane trailer home in the afternoon on September 22, 2016. A rational inference from that observation is

that one of the males could have brought the drugs into the trailer home. He also knew officers were looking for a third male, other than Justin and Chase, as part of the investigation later that day. A rational inference from that fact is that the third male would be at the trailer home, the place to where officers knew the methamphetamine was taken. Thus, based on objective facts and his rational inferences from those facts, Officer Buiter had reason to believe there was criminal activity going on in the trailer home on September 22, 2016. While officers did not immediately identify Daniel or the other male as they exited the trailer home on foot, it was not unreasonable for them to stop anyone leaving the trailer home that day based on their knowledge of the presence of methamphetamine.

The court disagrees with Daniel's argument that Detective Buiter's seizure of Daniel was more similar to an arrest rather than an investigative stop. As noted by the Eighth Circuit, an investigative stop can turn into an arrest if an officer uses unreasonable force. *Navarrete-Barron*, 192 F.3d at 790. Detective Buiter's actions, however, were not an unreasonable use of force. As Daniel points out, Detective Buiter did draw his weapon and he did order Daniel to the ground where he handcuffed Daniel—but only after the other male took off running, which was evasive behavior. Docket 99 at 231:1-233:11. Detective Buiter testified that his biggest concern was that Daniel was armed, as officers in the investigation had reason to believe Daniel was in possession of a firearm (*Id.* at 214:3-25), so securing Daniel on the ground was reasonable for safety concerns. *See United States v. Morgan*, 729 F.3d 1086, 1090-91 (8th

Cir. 2013) (noting that during a *Terry* stop, officers may take additional reasonably necessary steps, including handcuffing a suspect, to protect their personal safety during the stop). Thus, in the circumstances of this case, Detective Buiter did not exceed the limits of a *Terry* stop so as to turn the seizure of Daniel into an arrest, which would require the officers to show probable cause.

Once Detective Buiter approached Daniel, he smelled a strong marijuana odor emanating from Daniel's person. This gave Detective Buiter probable cause to arrest Daniel. *United States v. Perdoma*, 621 F.3d 745, 749 (8th Cir. 2010).

## VII. Searching the Cell Phones was Proper.

Lastly, Justin objects to Magistrate Judge Duffy's recommendation that the search of the cell phones should not be suppressed. Docket 117 at 11. Justin argues that the evidence discovered in the cell phones should be suppressed because of the deficiencies in the search warrants. Because the court finds the information in the search warrant affidavit was sufficient, the court does not need to address this objection.

## CONCLUSION

Law enforcement had reasonable suspicion to stop Justin and Chase in the grey minivan, and the ensuing search of the van was proper because the officers saw marijuana in plain view. All of Justin's statements to Trooper Steen in the patrol vehicle that were spontaneous and voluntary are admissible. But his statement in response to Trooper Steen's question about

26

securing a hotel room without an ID will be suppressed as a *Miranda* violation. Because the traffic stop and search of the van were proper under the Fourth Amendment, the evidence obtained was properly included in the affidavit for the search warrant of the trailer home and the vehicle registered to Chase. Finally, law enforcement had reasonable suspicion to stop Daniel upon exiting the trailer home, which resulted in a proper search and arrest of Daniel. Thus, it is

ORDERED that the report and recommendation (Docket 111) granting Justin Morales's motion to suppress in part and denying in part, denying Chase Guzman's motion to suppress, and denying Daniel Guzman's motion to suppress is adopted as modified by this opinion.

DATED this 19th day of October, 2017.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE